## Court of Appeals.

### April 11, 1905.

## THE PEOPLE v. WILLIAM SILVERMAN.

### (181 N. Y. 235.)

1. MURDER—INSANITY AS DEFENSE—SUFFICIENCY OF EVIDENCE TO WARRANT CONVICTION.

    The evidence upon the trial of an indictment for murder in which insanity was interposed as a defense reviewed, and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree.

2. RESPONSIBILITY FOR CRIME.

    Whatever may be the opinions of medical experts as to the insanity of a person charged with crime, but one test of responsibility is known to the law, and that is found in section 21 of the Penal Code; and when the evidence adduced upon the trial affords little reason to doubt that the defendant both knew the nature and quality of the act done by him and that the act was wrong, the jury is justified in holding him responsible whatever may have been his eccentricity of conduct, or however abnormal his disposition.

3. WHEN ADMISSION OF OPINION OF LAY WITNESS AS TO RATIONALITY OF
ACTS OF DEFENDANT NOT OBSERVED BY HIM, ALTHOUGH ERRONEOUS,
DOES NOT JUSTIFY REVERSAL OF JUDGMENT OF CONVICTION—CODE CR.
PRO. § 542.

Where a lay witness who has observed certain acts and conduct of
the defendant is called by the defense to testify to them, but is not
asked to express any opinion as to their character, it is erroneous to
permit the prosecution, against objection and exception, to show by the
witness that other acts, not observed by him but stated in hypothetical
questions, were rational. The error, however, is insufficient to justify
a reversal of the judgment of conviction where such testimony is not
altogether prejudicial to the defendant and no substantial weight
could have been accorded by the jury to the answers of the witness,
himself a prisoner.

APPEAL from a judgment of the Supreme Court, rendered
April 27, 1904, at a Trial Term for the county of Warren upon
a verdict convicting the defendant of the crime of murder in
the first degree.

The facts, so far as material, are stated in the opinion.

J. Edward Singleton and James S. Kiley for appellant.

The verdict is against the weight of evidence. (People v.
Decker, 157 N. Y. 186; People v. Barberi, 149 id. 256.) It
was error to allow a non-expert witness to answer hypothetical
questions. (People v. Conroy, 97 N. Y. 62; People v. Spencer,
179 id. 408; People v. Strait, 148 id. 566; Paine v. Aldrich,
133 id. 544.)

W. L. Kiley, district attorney (Beecher S. Clother of counsel)
for respondent.

There was no reversible error in the ruling of the court allow-
ing the questions asked by the district attorney on the cross-
examination of the witness James Scribner. (Paine v. Aldrich
133 N. Y. 543; People v. Conroy, 97 id. 62; Clapp v. Fuller-

ton, 43 id. 190; People v. Taylor, 128 N. Y. 398.) The verdict was not against the weight of evidence. (Ferris v. People, 35 id. 125; Walter v. People, 32 id. 159; People v. Taylor, 138 id. 398; People v. Majone, 91 id. 211; People v. Beckwith, 103 id. 364; People v. Johnson, 139 id. 358; People v. Constantino, 153 id. 37; People v. Decker, 157 id. 194; People v. Kennedy, 159 id. 352; People v. Sutherland, 154 id. 350.)

CULLEN, Ch. J.: The appellant was convicted at the Warren County Trial Term of murder in the first degree in having killed Rachael Kugle. The murdered woman resided with her husband and two children, a daughter of fifteen years and a son of nine, in a cottage in Glens Falls near the Hudson river. The parties were Polish Hebrews who had resided in this country for a number of years. The occupation of the defendant and that of his sister's husband was peddling. Some years before the homicide, which occurred on February 5, 1903, the defendant had moved to the west and married there. He separated from his wife and for some weeks was in a sanitarium in Wisconsin. About eight or nine months before the time of the murder he returned to his sister's residence in Glens Falls and resided with her until the commission of the crime. During this period his sister and her husband sought to induce the defendant to go to work peddling. With their request he refused to comply, remaining almost constantly in the house, a large part of the time in bed, and holding but little converse with the other members of the family. The refusal of the defendant to go to work was a subject of recrimination between his sister and himself. Early in the morning of the homicide the husband of the deceased went from his home on his route as a peddler. Shortly thereafter the two children went to school, leaving the deceased and the defendant in the house. When the children returned from school at noon they found the doors of the house fastened. Some of the neighbors having been called in, the

house was entered and the deceased was found in the cellar at the foot of the stairway unconscious and bleeding from several severe wounds in the head. Blood was found on the main floor of the house. Some of the wounds had been apparently inflicted by a blunt instrument, and the others by a sharp instrument. The woman was removed to a hospital, where the next day she died from her wounds. About the same time that the children discovered their mother in the condition described the attention of some workmen at a dam on the river was attracted by the cries of a man in the water struggling amid the floes of ice. Through their assistance the man, who proved to be the defendant, was rescued from the river and taken into an office in the vicinity. Here he told all those whom he met that he had killed his sister. To some he stated that she had told him to go out peddling, and that on his refusal she pulled his beard. Thereupon he struck her on the head with a flatiron, and afterwards dragged her into the cellar and struck her with an axe. To others he stated that his sister had struck him with a flatiron, seized his beard, and that then he took it from her and struck her. An axe was found on the premises with blood and human hair on it. It is not necessary to detail further the circumstances of the occurrence. Concededly, the defendant was the perpetrator of the crime, and unquestionably the circumstances were such as to warrant the jury in finding the deliberation and premeditation necesary to constitute murder in the first degree. That the deceased had assaulted the defendant rested solely on his statement, and in some of his statements he made no mention of such a fact. On the contrary, he told some of the witnesss that he picked up the flatiron and struck the deceased with it. The jury might well have discredited the story that deceased first assaulted him with the iron. If, however, such were the fact, it afforded neither justification nor palliation for the defendant's assault on the deceased with the axe after he had already taken the flatiron from her and struck

her with it.  The assault was so atrocious in its character that there can be no doubt that the defendant was guilty of the crime charged if he was mentally responsible, and the question of his mental condition was practically the only issue in the case.

That the defendant was eccentric clearly appeared.  He was morose and surly in his disposition, evincing a desire for solitude.  As already stated, a little more than a year before the homicide defendant had been treated in a sanitarium in Wisconsin during a period of six weeks.  The physician of the institution testified that he was suffering at that time from melancholia.  He also testified as an expert that in his opinion the defendant was insane at the time of the homicide.  Another physician testified that he examined the defendant in Glens Falls for life insurance before the homicide and rejected him because he deemed him insane, which condition, he said, still continued.  A third physician examined the defendant after the homicide and expressed the same judgment as to his mental condition.  In addition to this, two witnesses testified to occurrences and declarations of the defendant, tending to show that he was under the belief that people were planning to poison or injure him.  On the other hand, for the People two physicians who examined the defendant after the homicide testified that he was not insane, but entirely rational and his conversation coherent.  Prior to his being placed on trial the defendant was examined by a commission of physicians with reference to his insanity, and Dr. Henning, one of the witnesses for the defense already mentioned, admitted that on the day of that examination " to all appearances he was perfectly sane."  In addition to this, a number of lay witnesses, some of them of the same race and faith as that of the defendant, testified to continuous intercourse with him in which his conduct and conversation were entirely rational.  The issue of the sanity of the defendant was submitted to the jury in a perfectly fair and impartial charge which stated the law accurately, that if there was a reasonable doubt

as to the defendant's sanity he should be acquitted. The jury, by its verdict, has found that the prisoner was sane at the time of the commission of the crime.

Plenary as are our powers in a capital case, under section 528 of the Code of Criminal Procedure, we are not justified in interfering with that verdict. This section has been many times considered by this court, and it has uniformly been held that it is not in the province of the court to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such cases, and that with its decision this court cannot interfere unless it reaches the conclusion that justice has not been done. (People v. Boggiano, 179 N. Y. 267; 18 N. Y. Crim. 509; People v. Sutherland, 154 N. Y. 345; 12 N. Y. Crim. 495; People v. Corey, 157 N. Y. 332; 13 N. Y. Crim. 384.) We must say in this case, as was said in the cases cited, that we are unable to reach such a conclusion. Whatever may be the opinion of physicians or medical experts on the subject, there is but one test of responsibility known to the law, that found in section 21 of the Penal Code, which is but a statutory declaration of the law, as it had long prevailed: "A person is not excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as either, 1, not to know the nature and quality of the act he was doing; or, 2, not to know that the act was wrong." An examination of the evidence affords no reason for doubt that the defendant both knew the nature and quality of the act done by him and that the act was wrong. Whatever may have been his eccentricity of conduct, or however abnormal his disposition, there was no impairment of reason affecting his knowledge on this subject, and he was, therefore, justly held by the jury to be responsible for his crime. While the defendant's previous malady and infirmities of temper were insufficient to affect his legal responsi-

bility, they may warrant a mitigation of his punishment and his relief from suffering the supreme penalty of the law. An application for clemency, however, must be addressed to the executive branch of the government, by which, doubtless, it will receive proper consideration.

Only a single exception taken on the trial needs discussion. James Scribner, a prisoner in the county jail for three or four months during the time the defendant was there confined, was called by the defense to detail the defendant's acts and conduct, but was not asked to characterize them. On cross-examination, over the defendant's objection and exception, the following testimony was elicited from the witness: " Q. If you knew the man had killed his sister, brutally assaulted her with an axe and flatiron; that he had been tried for it and had been waiting trial for it again, would the fact of his crying and sighing impress you as the act of a rational or irrational man? A. His actions didn't seem to me as those of a rational man altogether. Q. Assume that a man is under the charge of murder for the murder of his sister, brutally assaulted her with an axe and flatiron, and is awaiting trial for that crime, would the fact that he cried impress you that he was rational or irrational? A. I should say it was rational; all right under the circumstances. Q. You say the fact that he sighed and cried under those circumstances impressed you as rational or irrational? A. Rational. Q. If this man's religion teaches him that he shouldn't have his whiskers and hair cut and he believed it and resisted it on that ground, how would that impress you, as rational or irrational? A. I would call it rational if his religion prevented him from doing it." The admission of this evidence was erroneous. The general rule of the extent a lay witness may express his opinion as to the mental condition of a person is well settled by authority. " When the layman is examined as to facts within his own knowledge and observation tending to show the soundness or unsoundness of the testator's mind he may char-

acterize, as rational or irrational, the acts and declarations to which he testifies. . . . But to render his opinion admissible even to this extent, it must be limited to his conclusion from the specific facts he discloses. His position is that of an observer and not of a professional expert. He may testify to the impression produced by what he witnessed, but he is not legally competent to express an opinion on the general question, whether the mind of the testator was sound or unsound." (Clapp v. Fullerton, 34 N. Y. 190; Real v. People, 42 id. 270; People v. Conroy, 97 id. 62; 2 N. Y. Crim. 565; People v. Spencer, 179 N. Y. 408; 18 N. Y. Crim. 536.) As a lay witness is thus strictly confined to the impression produced on him by the particular facts which he has observed and has disclosed on the trial, a hypothetical question based on other facts addressed to him is improper as it necessarily calls, not for the result of his observation, but for the exercise of his judgment. On cross-examination a different rule may prevail, for that which had appeared to the witness irrational might, if he had known antecedent facts, have been regarded by him in an entirely different view. The witness in this case, however, had not been asked by the defendant to express any opinion on the character of the acts to which he had testified. In the examination which we have quoted the district attorney made the witness his own and, therefore, the objections to the questions should have been sustained. Though we have called attention to this error so that a repetition of it in other cases may not occur, we are of opinion that it is insufficient to justify a reversal of the judgment. Under section 542 of the Code of Criminal Procedure the court must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties. It is difficult to imagine that the testimony recited affected the verdict rendered by the jury. In the first place, it was by no means altogether unfavorable to the defendant, for one of the answers made by the witness was: "His actions

did not seem to me as those of a rational man altogether." But beyond that the jury had heard testimony of experienced physicians and able experts as to the defendant's mental condition. They had listened to the testimony of lay witnesses narrating at length his life, conduct and actions. The witness, whose testimony we have discussed, detailed the acts and conduct of the prisoner while in jail. We cannot believe that any substantial weight could have been accorded by the jury to the answer of the witness, himself a prisoner, to the hypothetical question of the district attorney.

The judgment of conviction should be affirmed.

VANN, J. (dissenting) : The only substantial question for the jury to decide was whether the defendant was sane or insane when he took his sister's life. Strong support for a reasonable doubt upon this subject was found in the absence of apparent motive; the treatment of the defendant for insanity at an insane asylum about a year before the homicide; the opinion of the superintendent of that institution that he was insane then and insane when the killing took place ; the rejection of the defendant, six months before the homicide when an applicant for life insurance, upon the ground that he was insane; the opinion of the medical examiner, who was also an examiner in lunacy, that he was insane then as well as at the time of the alleged murder; the opinion of another expert to the same effect and the strange habits, conduct and conversation of the accused when there was no reason to believe he was feigning.

Upon the controlling question of insanity the district attorney was allowed to show, not by way of proper cross-examination, but as a part of his own case, the opinion of a jail prisoner that certain important acts of the defendant, not observed by the witness but stated to him in a hypothetical question, were rational under the circumstances. This witness was even allowed to state in answer to one question, not that the *acts*

assumed and recited therein were rational, but that the man who did the acts was rational. All this evidence was objected to upon the proper ground and exceptions were duly taken to the rulings which virtually permitted an ignorant lay witness to give his opinion as to the mental condition of the defendant.

Neither argument nor authority is needed to show that this was wrong. No one disputes it. The prevailing opinion demonstrates it. It stands as a conceded fact that the defendant was convicted upon evidence, a part of which was clearly erroneous. The conviction cannot be sustained unless we are able to adjudge that this evidence did no harm to the defendant. How can we so decide, as the evidence, though incompetent, was material, for it bore upon the vital point of the case and it was the duty of the jury to consider it. The error was not technical, for it allowed a non-expert to give expert evidence as to the defendant's sanity. While we may overlook erroneous evidence received without objection, and even objections and exceptions which do not affect a substantial right, we cannot disregard an error founded upon an exception duly taken, unless we can say judicially that it " could not in reason have changed the result." (People v. Bonier, 179 N. Y. 315, 324; 18 N. Y. Crim. 516, 527.) As we have recently said, " a presumption of injury conclusively arises whenever it is apparent that the erroneous ruling may have affected the verdict." (Id.) Could this evidence, in view of the strong probability that the defendant was insane but a short time before the homicide, have aided in removing a reasonable doubt? Can we say that it did not? Can we say it had no power to persuade, or to influence, or to turn the scale against the defendant? Can we say that a witness, called by the defendant and presumed to be friendly to him, in characterizing his actions as rational and in giving an opinion that he was rational, could not have offset to some extent the opinions of the defendant's experts, whose testimony was subject to the popular preju-

dice against professional witnesses? Can we look into the minds of the jury and say that they gave no heed to the opinion of the defendant's friend, who saw him daily when a fellow-prisoner in jail?

I cannot answer these questions, and, hence, I cannot concur in the conclusion that, although the evidence was erroneous and the objections thereto should have been sustained, still the judgment is right, because it is reasonably certain that no harm came to the defendant. I vote to reverse.

GRAY, HAIGHT and WERNER, JJ., concur with CULLEN, Ch. J.; O'BRIEN and BARTLETT, JJ., concur with VANN, J.

Judgment of conviction affirmed.

### LAY OPINIONS AS TO RATIONALITY.

The attitude of the Court of Appeals with respect to questions which may be put to lay witnesses as to matters of rationality or irrationality is severely criticised by Mr. Wigmore in his recent treatise. He cites all the New York cases, so that the rulings can be conveniently seen at a glance, and closes by saying: "Of these rulings all that can be said is that they belong rather to some system which decides controversies by mumbling magic formulas before a fetish." (Wigmore on Evid., Vol. 3, § 1938, pp. 2573-4.)

Since the Silverman case, there have been two later decisions (Matter of Meyer, 184 N. Y. 54; and People v. Pekarz, 185 id. 470.) These cases should be read with the recent case of People v. Spencer, 179 N. Y. 408; 18 N. Y. Crim. 536.

In the Pekarz case, a lay witness was asked whether certain acts which she had described had impressed her as being the acts "of a rational or irrational *person*." It was held that the question was properly excluded and that the witness should have been confined to a bare statement whether the *act* itself had impressed the witness as rational or irrational.