## COURT OF APPEALS.

### Apr. 2, 1907.

# THE PEOPLE *v.* LEONARDO BRONCADO.

#### (188 N. Y. 150.)

MURDER—SUFFICIENCY OF EVIDENCE—APPEAL FOR CLEMENCY CANNOT BE
    CONSIDERED BY THE COURT OF APPEALS—APPLICATION MUST BE
    MADE TO THE GOVERNOR.

Where, upon the trial of a defendant indicted for murder, there is evidence sufficient to sustain a verdict convicting the defendant of murder in
the first degree, the judgment of conviction must be affirmed; the fact
that there are circumstances in the case which tend to lessen the moral
guilt of the defendant and should relieve him from suffering the extreme
penalty of the law, cannot be taken into consideration by the Court of
Appeals; such facts and circumstances must be submitted, on an appeal
for clemency, to the governor of the state, to whose judgment, under the
Constitution and the law, the whole subject is confided.

APPEAL from a judgment of the Court of General Sessions
of the county of New York, rendered October 30, 1906, upon
a verdict convicting the defendant of the crime of murder in
the first degree.

The facts, so far as material, are stated in the opinion.

*Robert Townsend* for appellant. This is clearly not a case
of murder in the first degree upon the law or the evidence.
(*People* v. *Keenan,* 101 N. Y. 618; *People* v. *Leighton,* 88
N. Y. 117; *People* v. *Majone,* 91 N. Y. 211; *People* v. *Con-
way,* 97 N. Y. 75.) The defendant did not use the pistol until
he had been struck by the deceased in the groin, which " bent
him double." The intention to kill must precede the act by
some appreciable space of time. (*People* v. *Majone,* 91 N. Y.
211; *People* v. *Walworth,* 4 N. Y. Cr. Rep. 355.)

*William Travers Jerome, District Attorney (Robert C.
Taylor* of counsel), for respondent. The evidence justified

the verdict of murder in the first degree. (*People* v. *Ferraro,*
161 N. Y. 365; *People* v. *Furlong,* 187 N. Y. 198; *People*
v. *Conroy,* 97 N. Y. 62; *People* v. *Schmidt,* 168 N. Y. 568;
*People* v. *Zachello,* 168 N. Y. 35; *People* v. *Sliney,* 137 N. Y.
570; *People* v. *Boggiano,* 179 N. Y. 267; *People* v. *Johnson,*
139 N. Y. 358; *People* v. *Rodawald,* 177 N. Y. 408.)

EDWARD T. BARTLETT, J., The scene of the homicide was
on Christie street, in the city of New York, between Houston
and Stanton streets, on the evening of June 1st, 1906.

The defendant, Leonardo Broncado, is an Italian, about
twenty-five years old, by trade a painter, unmarried, and at
the time of his arrest living in his father's family at 185
Christie street. He was industrious and of good repute. He
stands convicted of the crime of murder in the first degree for
the killing of one Francisco Lapaglia, on the evening of June
1st, 1906, during a fight, in the course of which the defendant
shot the deceased with a pistol inflicting a fatal wound.

It appears that the defendant is of rather frail physique,
while the deceased was some ten years his senior and a strong
man. The defendant testified that he had been in this coun-
try about three years and the deceased some nine or ten years;
that he knew the latter in Italy. The evidence is substan-
tially uncontradicted, with a few exceptions to which reference
will be made.

It appears that some six months before the homicide, about
December, 1905, the defendant and the deceased, with sev-
eral companions, met in a saloon and engaged in an Italian
game of cards known as "tucco." It is unnecessary to de-
scribe the game in detail. It suffices to say that the defendant
and the deceased had a disagreement, nearly resulting in an
affray, and thereafter the deceased, on a number of occasions
when meeting the defendant, displayed great hatred and bitter-
ness and made charges in the presence of others reflecting upon

the chastity of the women in the defendant's immediate family; also stated that defendant and his father were dishonored, were cuckolds. It is clear that the deceased and the defendant, owing to their excitable Italian natures, evidently entertained feelings of mutual hatred which rendered their occasional meetings liable to end in violence, if not bloodshed. The defendant testified that on the first of June, the day of the homicide, his employer had notified him that work in the painting trade was slack and that he must find some other job; that he hoped to take him back soon. The defendant at about half-past seven o'clock in the evening left his home, 185 Christie street, and proceeded to a bar room on the same block, 216 Christie street, in search of one Dominick Graziano, whom he thought might assist him in obtaining work. He did not find his friend and stepped outside the saloon, intending to wait for him. According to the defendant's story the deceased happened to be in the saloon and followed him to the street, repeating his offensive remarks as to the women of defendant's family—their lack of chastity—and the fact that defendant and his father were cuckolds.

We now approach the fatal encounter, where the evidence is in some respects conflicting. The defendant states that he left the deceased after he renewed the quarrel in front of No. 216 and crossed over and stood in front of another saloon, No. 211, and near the door or hallway of No. 209; that the deceased followed him and forced him into the hallway, drew a knife and threatened his life; that after a violent and stormy interview he made his escape and went down to Stanton street, which is only a short distance, where he met a friend and followed him back to the vicinity of No. 211, where they met the deceased, who immediately attacked the defendant.

The testimony of one Sharp, a witness for the prosecution, is to this effect: That he was walking down Christie street when he saw two men exchanging blows; that there were

three other men present who attempted to separate the combatants and finally succeeded; two of these men had hold of the deceased and the other man and the defendant walked to the opposite side of the street, a distance of about twenty feet. The witness then states: " I heard the deceased break from the fellows who were holding him, and he went towards the defendant and made a swing at the defendant to hit him, but the man who was standing with the defendant stepped in front of him and avoided him being hit. About that time the deceased made a kick at the defendant, but I do not think he kicked. The defendant then stepped off the pavement, took a revolver from his right hand hip pocket and shot the deceased." This witness, being questioned by a juror, said: " Yes, the deceased came back to attack the defendant, he ran against the defendant, in order to attack him again. * * * The defendant, he was still, he was with this peacemaker; he was going to go—he saw the deceased coming towards him, don't you know, he was going to make ready to give him a fight, but the peacemaker was quieting him, and the deceased made a spring at him, and the peacemaker avoided his being hit, and the deceased kicked at him." Another witness for the People swore that the deceased kicked defendant in the groin, whereupon the defendant shot him.

Ballister, a witness for the defense, thus describes the action of deceased after he freed himself from those who sought to restrain him: " Hardly had Lapaglia got loose when he rushed against Broncado and delivered a kick on him and blow with the fist on the head. He kicked him (indicating the region of the groin) ; when Broncado was kicked he doubled up. Lapaglia said when he rushed at Broncado, ' I want to break your horns,' and he was clenching his fist in that moment and rushed against him. He gave Broncado one kick and one blow with the fist. While he (Broncado) doubled up Lapaglia

struck the attitude of striking him again, and then I heard the report of a pistol."

The defendant testifies as to this crisis of the fight as follows: " While I was under the pain and crying from the blow, I drew the pistol and fired. Just before I fired Lapaglia was again in a striking attitude against me, while I was bent down, and I thought this time he kills me and then I drew the pistol."

It is clear from the testimony quoted that in this last encounter, resulting in the slaying of the deceased, he was the aggressor; it is also clear that in a physical encounter the defendant was no match for his adversary; it was an unequal contest. It is also to be remarked that apart from defendaut's evidence the People proved the deceased the aggressor.

The question naturally arises why the jury convicted the defendant of murder in the first degree. If the case had rested on this last encounter alone such a result would have been impossible. There was, however, submitted to the jury other evidence that enabled them, if they saw fit, to arrive at the verdict rendered. Two witnesses testified each to a threat the defendant had made to shoot the deceased.

The further fact that the defendant was armed on the night in question was calculated to weigh heavily against him.

The defendant took the stand and denied he had ever made the threats sworn to by the two witnesses for the prosecution; he also explained how it happened he carried a pistol on the day in question. In regard to the pistol the defendant was corroborated by a gunsmith, Ignazzio Maggio, an unimpeached and disinterested witness. He testified that defendant came to his shop on May 31st, the day before the homicide, and said he had a pistol; wanted to have it cleaned and sold; defendant was to bring it to witness' shop the next day; did so, and found the place locked, and so kept pistol in his pocket. Maggio testified that he often locked the shop in order to do

outside work. We thus have conflicting evidence, which justifies the jury in finding one way or the other on all the evidence in the case.

While of the opinion, as above expressed, that the evidence justified the verdict of the jury, and that interference with their determination is not permissible, we fully appreciate that there are circumstances in this case, such as the failure of the defendant to use his weapon at the beginning of the altercation, and the fact that the deceased was the aggressor in the final struggle which resulted in the fatal shot, while not controlling the legal character of the defendant's crime, tend to diminish his moral fault, and, on an appeal for clemency, it may be, should relieve him from suffering the extreme penalty of the law. With these considerations we cannot deal. They must be submitted to the governor of the state, to whose judgment under the Constitution and the law the whole subject is confided, and from whom they will doubtless receive due weight.

The following cases illustrate the practice we have adopted:

Judge EARL, in concluding his opinion in *People* v. *Fish* (125 N. Y. 136, 155, 8 N. Y. Crim. 129), said: " A careful consideration of the whole case has constrained us to believe that no error was committed at the trial to the prejudice of the defendant. We think all the elements constituting the crime of murder in the first degree were proved by uncontradicted evidence. The crime was undoubtedly committed, like many others, under the influence of intoxicating liquor, but for which the deadly blow would not have been dealt. We sit here to administer and to uphold and enforce the principles of law and justice applicable to the cases presented to us, uninfluenced by sentiments of commiseration or of mercy. It may be that if we had jurisdiction to listen to an appeal for mercy we would relieve the defendant from the extreme penalty of the law. But such relief can be given only by the

governor of the state, to whom very properly, under the circumstances of this case, an application can be made."

Again, in *People* v. *Kerrigan* (147 N. Y. 210, 215, 9 N. Y. Crim. 555), Judge O'Brien said: "The courts, in the administration of criminal justice, are bound by settled rules. If their effect and operation should be mitigated in a particular case by reason of special facts or circumstances, that power rests with the executive department of the government and not with judicial tribunals. There are some features of this case that deserve, and doubtless will receive, careful consideration in that department."

In *People* v. *Silverman* (181 N. Y. 235, 240, 19 N. Y. Crim. 360), Chief Judge Cullen said: "An examination of the evidence affords no reason for doubt that defendant both knew the nature and quality of the act done by him and that the act was wrong. * * * While the defendant's previous malady and infirmities of temper were insufficient to affect his legal responsibility, they may warrant a mitigation of his punishment and his relief from suffering the supreme penalty of the law. An application for clemency, however, must be addressed to the executive branch of the government, by which, doubtless, it will receive proper consideration."

The judgment appealed from should be affirmed.

Cullen, Ch. J., Haight, Willard Bartlett, Hiscock and Chase, JJ., concur; Gray, J., concurs in result.

Judgment affirmed.