Joseph A. Martinis, J.
In aid of sentence, defendant subsequent to being adjudicated guilty of a felony by a jury trial, was committed to Kings County Hospital for psychiatric evaluation. This commitment was pursuant to the provisions of the Code of Criminal Procedure. In accordance with the requirements of said code, Dr. Emil Gr. Winkler and Dr. Edward Podolsky were designated as the examining psychiatrists charged with the duty of ascertaining the mental condition of defendant at the time of their examination.
The determination of guilt against Pugach was arrived at on July 14, 1961. On the same day he was admitted at Kings County Hospital. On September 19, 1961, the report of the examining doctors was filed.
Both defense counsel and the District Attorney were served with copies of the report rendered by Doctors Winkler and Podolsky, as provided in section 662-a of the Code of Criminal Procedure. The diagnosis and conclusion set forth by the aforesaid psychiatrists in the report of September 19, 1961 was as follows:
“ diagnosis : Schizophrenic Reaction — Paranoid Type.
“ conclusion : It is our opinion that Burton Pugach is presently insane, not imbecile and is incapable of understanding the charge against him, the proceedings, and of making his defense.”
After receipt of a copy of the aforesaid report, the District Attorney moved, pursuant to section 662-a of the Code of Criminal Procedure to controvert said report. A sanity hearing was then directed.
The issue presented at this hearing was whether the facts which would be presented to the court would constitute a valid basis for acceptance or rejection of the report rendered by Doctors Winkler and Podolsky. Upon the determination of this issue would rest whether or not defendant’s mental condition permitted the conduct of any further criminal proceedings involving him, at this time.
The law of this State is quite clear as to the criteria to be applied to a defendant in evaluating whether his mental condition prevents his being a party to criminal proceedings. The *940 basic standards to be applied are a matter of statute. (Penal Law, § 1120.) Repeated judicial determinations establish that under our law a medical diagnosis of mental illness does not, in and of itself, immunize one from criminal responsibility. In order to be excused from being a party to criminal proceedings as a result of a mental condition, it must be shown that the condition from which a defendant suffers is of such a nature that his reasoning power is impaired to the extent that he cannot understand the nature of the charges against him, and make a defense thereto. Mental disturbance of a nature which does not affect one’s reasoning powers, set forth in our law, cannot act as a shield to a defendant. (People v. Silverman, 181 N. Y. 235; People y. Wolfe, 278 App. Div. 967, affd. 303 N. Y. 752; People ex rel. Ryan v. Murphy, 255 App. Div. 748; People ex rel. Peabody v. Chanler, 133 App. Div. 159, 162, affd. 196 N. Y. 525; People v. Johnson, 13 Misc 2d 376; People v. Wolfe, 198 Misc. 695; People v. Irwin, 196 Misc. 751, 763-767.)
The hearings encompassed a considerable period of time, during which a great deal of testimony was adduced, comprising over 2,200 pages. All of this testimony has been carefully reviewed.
On the second day of the hearing, defendant indicated to the court that he wished to represent himself in these proceedings. Prior to the commencement of the hearing, both defendant and his counsel had apprised the court of the fact that defendant contemplated such an application. However, when the hearings commenced neither defendant nor counsel made such an application. When the application was made, it was accompanied by a declaration by defendant that was clearly geared to lay the groundwork for a claim that the failure to mistrial the proceedings and recommence them at some future date constituted reversible error.
The application of the defendant presented a novel situation. A situation wherein a defendant allegedly found to be insane by examining psychiatrists seeks leave of the court to represent himself, where his purpose is to attempt to uphold the conclusions of the examining psychiatrists and confirm a diagnosis that he is insane, and incapable of understanding the charge against him and making a defense thereto.
Section 8 of the Code of Criminal Procedure provides that a defendant has a right, in a criminal action, “to be allowed counsel as in civil actions, or he may appear and defend in person and with counsel ’ ’. It is this section of our code that the defendant invoked in support of his application.
*941 While at first glance, as stated, the application of the defendant appears novel, a search of existing authorities reveals that this application is not without some precedent, in another jurisdiction.
In Matter of Vanauken (10 N. J. Eq. 186) decided in 1854, a commission in the nature of a writ de lunático inquirendo was issued to inquire of the lunacy of one, Daniel Vanaulcen. The commission was executed and Vanauken was found to be a lunatic and of unsound mind. Application was thereafter made by the alleged lunatic, in person, to traverse the inquisition. The court held that the question of whether the alleged lunatic may traverse the inquisition is a matter addressed to the discretion of the court, and if upon a review of the evidence there exists a reasonable doubt as to the correctness of the finding, the traverse should be allowed.
In passing upon the application of the defendant to represent himself in the instant proceeding, this court considered the following facts:
First: That the defendant was a former attorney, actively engaged in the practice of the law, for a period of approximately 10 years. That he was a member of the Bar of this State as recently as 1960, his disbarment resulting from a conviction for violation of subdivision 5 of section 1897 of the Penal Law.
Second: The successful contravention by defendant of the Bellevue Hospital Report dated April 25, 1960, which report indicated the defendant to be insane and incapable of understanding the charge, indictment, and proceedings, and of making a defense thereto.
Third: The conduct of defendant during his trial under Indictment No. 1332-1959. This proceeding was held before this court. It consumed approximately 14 weeks ending as recently as July 14, 1961. During that trial the court had the opportunity of conversing with defendant on numerous occasions and of observing him over a protracted period.
Fourth: The verdict of the jury convicting the defendant of the counts alleged in the Indictment No. 1332-1959, a verdict specifically rejecting the plea of insanity interposed as a defense by defendant.
Fifth: That in between the period between the verdict of the jury, on July 14, 1961 and the commencement of the instant sanity hearing on October 25, 1961, defendant pro se had prepared and submitted to this court motions in arrest of judgment, attacking the sufficiency of the indictment, and seeking *942 other relief. One of these motions comprised over 100 pages, setting forth 22 separate and distinct points of law in support of defendant’s contentions therein. While not passing upon the validity of the questions of law raised, nevertheless the arguments presented in all of these papers reveal clear thinking, the capacity for lucid and coherent expression, unimpaired reasoning powers, an astounding memory, and a complete comprehension of the import of all of the proceedings that had theretofore taken place, and of defendant’s then legal status. The oral argument by defendant in support of his application for permission to represent himself in the pending proceedings, was forceful, rational, pressing and cogent; and clearly demonstrated to this court defendant’s ability to capably and intelligently represent himself.
Under the circumstances the court could not in good conscience possibly justify denying defendant his statutory and constitutional right to represent himself,
Assuming, arguendo, that the hearing resulted in a determination that defendant is in such a mental state as to render him incapable of understanding the nature of the charge, indictment, proceedings or of making a defense thereto, then nothing will have been lost, since the District Attorney will have failed in his effort to controvert the report of the Kings County Hospital. On the other hand, should the District Attorney succeed in controverting the report, then it will have been determined that the defendant was in such a state of sanity as to have an absolute legal right to have represented himself. Under the latter circumstance the court would have committed grave error in denying him this right. Further, if defendant were in the state alleged in the report of Kings County Hospital certainly his conduct of the hearing would serve to cast light upon the validity of the finding expressed in the report. After all, in the last analysis — what we are actually concerned with is defendant’s capacity to understand and cope with the criminal proceedings he is faced with in the courtroom, and not the problems presented to him in the hospital examining room.
Nevertheless, while the court granted the application of defendant to represent himself, the court did direct that Frances Kahn, Esq., the defendant’s attorney of record under Indictment No. 1332-1959 should remain at the counsel table, as an officer of the court. The purpose of the court in making this assignment was twofold: One, to permit Miss Kahn to render whatever legal assistance Pugach might desire in this proceeding; and secondly, the court felt that should defendant’s conduct reveal any symptoms of the legal insanity attributed to him by Kings *943 County Hospital, Miss Kahn would be in a position to step in and protect defendant’s rights, in the interest of justice. At no time did defendant’s conduct give this court the slightest reason to believe that Pugach was not legally capable of continuing to represent himself or that justice required that Miss Kahn act in his behalf alone. It must be stated most strongly, that at all times, defendant’s conduct indicated the exact contrary.
It was further noted, that defendant regularly availed himself of Miss Kahn’s assistance. They regularly conferred and frequently consulted with each other. Miss Kahn obviously assisted the defendant in a most able manner throughout these proceedings. Her conduct was always highly indicative of complete co-operation with defendant’s purposes. Of particular note is her diligent assistance to defendant in the courtroom of his use of the volume of material and technical literature which the defense availed itself of, for the purpose of examining and cross-examining technical witnesses.
This hearing was commenced on October 25, 1961; it consisted of many sessions and was terminated on February 1,1962, subject to the court’s decision. The District Attorney and the defendant Pugach were afforded the opportunity to present their contentions, and the court granted each of them considerable latitude with respect to each item of proof offered. Many witnesses were called by both sides. Most of said witnesses were offered as experts in the fields of psychiatry or psychology.
The testimony reveals that the medical question at issue was essentially whether defendant was suffering from a psychotic condition which would impair his reasoning power to such an extent that he could not understand the proceedings or make a defense thereto or from merely some neurosis. The latter condition centers about an emotional disturbance and does not involve any impairment in reasoning capacity. In such a case no legal basis would exist for not conducting further criminal proceedings involving defendant.
The basis offered by Dr. Winkler and Dr. Podolsky for their conclusion, in and of itself, was somewhat less than convincing. A penetrating and lengthy examination by the District Attorney, defendant, and the court could not evince from these doctors a criteria which would justify their decision. The defendant also called as a witness, the psychologist who had given him extensive psychological tests at Kings County Hospital. This woman stated that the records she had made of these tests constituted a careful account of defendant’s responses. However, the witness was of obviously limited *944 experience in her field and was unable to clearly or convincingly establish that the conclusions she arrived at, from data she had accumulated, had a valid basis.
Following the testimony of the aforesaid psychologist, defendant attempted to bolster the conclusions she had offered by calling her superior, a man of much wider experience and more impressive qualifications than the examiner herself. This witness testified that he had made what amounted to an independent evaluation of the data gathered by his subordinate. This evaluation was essentially based upon the psychological data recorded by the prior witness. The supervisor had not given Pugach any tests other than those given by his subordinate.
The supervising psychologist stated that he indorsed his subordinate’s conclusions, but was reluctant to accept her basis for these conclusions. His testimony impliedly requested the court to disregard the criteria of the examining psychologist, but accept her conclusions on the basis he would offer to justify them. Coupled with the witness’ apologetic attitude for the work of a staff which he stated is imposed upon him by the mechanics of civil service, his analysis of the psychological data was considerably less convincing, and failed to impress the court as having the same logical basis, as did the analysis of the same data that was offered by Dr. Zygmunt A. Piotrowski. The latter, a psychologist of international repute was called by the People as a witness. He testified to making an independent analysis of the psychological data pertaining to this defendant. It was his opinion that a correct evaluation of the psychological data clearly indicated that defendant suffered from no impairment of reasoning or understanding ability.
It is to be noted that the testimony of Dr. Lawrence I. Kaplan, a psychiatrist called by the People, was most enlightening on the subject of medically differentiating when a symptom indicates a condition which would impair reasoning and understanding, from those signs which reveal only a neurosis that leaves the thinking process unaffected.
It must be noted that the demeanor and context of the testimony of the various so-called expert witnesses imposed upon this court the duty not only to evaluate conflicting professional opinions, but to also determine obvious questions of credibility. Both the nature of the testimony and manner in which it was offered necessarily raised serious issues of credibility which had to be decided in reaching what is humbly deemed to be a proper decision in this matter. The determination of all questions of credibility by this court are such as to be consistent with the ultimate conclusion compelled by the evidence.
*945 When all of the testimony is viewed in its entirety, in conjunction with the legal productions of defendant, that were composed during the period of his examination at Kings County Hospital, as well as the manner defendant conducted these proceedings, the court is constrained to find defendant legally sane. In view of the overwhelming volume of direct evidence that defendant clearly understands the nature of the proceedings and is participating in a defense thereto, any other decision would constitute a mockery of justice. The medical data offered as a basis for subjectively concluding defendant incapable of understanding the nature of pending criminal proceedings and making a defense thereto cannot overcome Pugach’s consistent course of conduct throughout these hearings. His efforts in other legal proceedings relative to the indictment upon which he was tried — Pugach’s legal work, offers repeated evidence of his unquestionable understanding of the nature of all pending proceedings as well as of his ability, far beyond that of the average defendant, to make a defense thereto.
In People v. Wolfe (198 Misc. 695) the court was faced with a situation similar to the instant case. Wolfe claimed, in open court, that he could prove he was the Messiah. Pugach has, rather insincerely, on occasion, professed a martyrdom that akins him to John the Baptist. The evidence in this case, even assuming arguendo, that if this claim were accepted as a sincere expression of a defendant’s opinion, would not sustain any conclusion other than that which the court arrived at in the Wolfe case, when it stated (p. 699): “ Specifically, Joseph Smith, who claims to have found the books of Mormon, and whose cult of Mormonism is derived therefrom made similar claims. Others today, such as Father Divine, entertain similar ideas. Yet this type of individual without arguing as to the truth or falsity of their claims is perfectly competent, and has been found to be able to live in normal society; to show the judgment in business and in their daily life which is consistent with normal behavior however much the majority of individuals differ with them or their status as the Messiah ’ ’.
The issue in this case is aptly summarized by the language of the aforesaid Wolfe opinion, when it is stated (pp. 700-701):
“ As heretofore stated, the factual question to be determined in this proceeding is whether or not this defendant possesses the capacity to understand the charge pending against him or to make his defense thereto. While the opinion of experts are entitled to due consideration, they are not conclusive upon the court. In resolving the factual issue here involved, the court is required to apply legal, not medical tests. (People v. Irwin, *946 166 Misc. 751; Matter of Martin, 82 Misc. 574.) A clear distinction must be made between an insane person’s responsibility for the commission of the crime, as distinguished from the law which precludes trial for a crime. * * * However, the prohibition against trial, sentence to punishment, or punishment, is that one cannot be tried or sentenced or punished while in a state of idiocy, imbecility, lunacy or insanity so as to be incapable of understanding the proceeding or making his defense. We are concerned in this proceeding with the latter limitation.
‘ ‘ This case illustrates quite graphically the dilemma into which the layman is projected in trying to evaluate the findings of medical experts in a field which is itself subject to so much internal conflict and controversy, and has not as yet come of age. In order to determine the issue presented here, the court finds itself in a position of acting as the judge of the facts at issue, as well as of the law. It has become necessary for the court to apply the test of common sense to the facts precisely as a trial jury would be required to do and because of that the court must weigh the credibility of the evidence * * * Furthermore, the court must base its opinion in part upon its direct observation of the actions and demeanor of the defendant himself, just as a jury is permitted to do.”
The court has noted that Pugach has acted quite rationally throughout the hearing. Whenever he had occasion to speak and address himself to the questions involved, he spoke intelligently. His knowledge of the proceedings and what they mean has been remarkably incisive. The manner in which he presented and argued many points of law has been most impressive. He appears to be well oriented in the fields of law, psychiatry and psychology. He displayed unusual ability in the direct and cross-examination of witnesses, developing the sequence of each examination and proceeding with familiarity with the technical terms involved.
Most significantly, if ever we must respect the opportunity afforded the Trial Judge to evaluate the character of the person confronting him, it is in a proceeding of this nature, where the Judge enjoyed a unique position to form an estimate of his qualities. In fact, Pugach’s sanity would seem to be demonstrated by his own actions, speech, logic and general demeanor.
This court would be derelict in its duty were it to blind itself to reality by adhering to defendant’s request that it disregard his performance throughout these hearings in arriving at a decision in this matter. Even Pugach’s obvious physical vigor and alertness on each and every day of these proceedings is of paramount importance in properly evaluating this defendant. *947 This is pertinent in several respects, hut it is particularly relevant when viewed in conjunction with his repeated self-serving claims of physical incapacity, which very consciously and incorrectly attempts to convey a false picture of a physical disability which did not exist at the very moment it was being professed.
Defendant’s performance during these hearings is most significant. His conduct clearly revealed understanding and a capacity for sound reasoning, as well as legal acumen. Both defendant and his counsel argue that if defendant were sane he would not have revealed his true condition by acting as his own counsel. The logic of this argument is indeed fascinating. It contends that if defendant has proven himself competent by his own conscious acts, certainly this revelation of his sanity by his own acts proves that he is insane. The court cannot accept the validity of this argument.
It must be remembered that the defendant frequently revealed his familiarity with People v. Esposito (287 N. Y. 389). In that case the defendants were found sane despite continued irrational demonstrations intended to show complete lunacy. That Pugach decided to stake his future on his obviously exceptional legal acumen rather than an attempt to feign complete lunacy, or leave his future to counsel whom he may judge to be less proficient than himself, cannot erase the conclusion which the court is compelled to arrive at based upon that which has occurred throughout this hearing.
It is significant that defendant introduced into evidence the records of the Kings County Hospital relative to his confinement during the progress of this hearing. These records reveal that at the very time Pugach was most capably and vigorously applying his best legal efforts in the courtroom to establishing, by the adducing of competent evidence, that he was legally insane, his conduct at Kings County Hospital followed a different course directed to the same end. At said hospital Pugach followed a regular pattern of conduct which created a record of a recalcitrant lunatic who would not even take nourishment unless tube fed. He compiled this medical record at the very time when he was also devoting himself to the tremendous reading and writing effort that was obviously necessary in order to prepare for his courtroom efforts.
Of further significance is the fact that during many of the same periods that the Kings County Hospital record implies hunger strikes by defendant, Pugach would make “ off-the-record ” applications to this court to have food brought into him during the luncheon recesses in the proceedings.
*948 It would be contrary to fact and reality to accept a conclusion that this defendant is not capable of understanding, and participating in criminal proceedings. The language of the Court of Appeals in People v. Silverman (181 N. Y. 235, 240, supra) aptly summarize the condition of this defendant: “ Whatever may have been his eccentricity of conduct, of however abnormal his disposition, there was no impairment of reason affecting his knowledge ”.
The report of the Kings County Hospital dated September 19, 1961 is controverted. Defendant is adjudged legally sane under the laws of our State.