# Court of Appeals.

October 5, 1897.

## PEOPLE v. CHARLES BURGESS.

1. CRIMINAL LAW—INSANITY.

It is not every weak or disordered mind that is excused from the consequences of crime. It is only those who at the time of committing the criminal act, were laboring under such a defect of reason as either not to know the nature and quality of the act they were doing or not to know that the act was wrong.

2. SAME—SUMMONING JURY.

The sheriff does not conform to the provisions of § 1048 of the Civil Code, where he notifies the persons, drawn as jurors to attend at a term of court, by mailing a notice thereof to them, inclosing a card to be signed and returned, admitting service of the notice.

3. SAME.

But the error, in such manner of notification, is harmless, if all the jurors drawn who are qualified to sit, personally appear in court at the time appointed.

4. SAME—COMPUTATION OF TIME.

The statutory construction act does not materially change the existing rule for the computation of time, except, perhaps, to more definitely fix the event from which the count is to be made.

5. SAME.

The day to be excluded, under the act, in making the reckoning, is the day of the specified event, from which the days are to be counted, and, in making the count back from that time, the day, on which the required act was performed, may properly be included.

6. SAME—EVIDENCE—BLOOD.

A witness, on the trial of an indictment for homicide, may testify to the effect that a certain spot indicated by him upon the lantern used on the night of the homicide, was blood, where he previously testified that he saw the lantern on the night or morning in question, had his attention called to it at the time and that then the blood was fresh. It does not require an expert to distinguish blood from other things or objects with which every person is familiar.

7. SAME—IMPEACHMENT.

Where the district attorney, in examining defendant's witness, enters upon a new field, he makes him his own witness, and cannot properly lay the foundation for contradicting him, upon that subject.

**8. SAME—COURT OF APPEALS.**

The Court of Appeals has the power to order a new trial for the reception of incompetent evidence even though no exception has been taken; but this power is exercised only in cases where manifest injustice has been done, and it is apparent that a different result might have been reached.

**9. SAME—AFFIRMANCE.**

The Judgment will be affirmed, where no harm has resulted to the defendant from the admission of incompetent evidence.

Appeal from a judgment, convicting defendant of murder in first degree.

Hull Greenfield and Harry T. Dayton, for appellant.

George W. Nellis, Dist. Atty., for the People.

HAIGHT, J. Henry V. Whitlock was a farmer, fifty-eight years of age, living in the town of Victory, in the county of Cayuga, with his wife, Catharine, who was about thirty-seven years of age. The defendant, a strong, powerful man, of about the same age of Mrs. Whitlock, was in their employ as a hired man, working upon the farm. He lived with them, eating at the same table, and sleeping in a room upstairs, while Whitlock and his wife occupied a bedroom on the ground floor. The residence was upon the west side of a road running north and south, and the barns were upon the east side of the roadway. There was a field of growing corn about 15 rods north of the barn, and in the fence between the corn-field and the road were bars across the passageway from the road to the field. On the 6th day of August, 1895, Whitlock and the defendant had been engaged in harvesting oats. After supper the defendant took the horses to the pasture, some distance from the house, and Whitlock separated the young cattle from the milch cows, putting the young cattle in the pasture, and retaining the milch cows in the lane. He fed them some sowed corn, after which he went into the house, removed his boots, and sat down with his wife in the dining room. After a while the defendant passed through the room, on his way to his bedroom, stopping to look at a pair of gloves at the request of Whitlock, which his wife had cleaned for him that day. Shortly after the defendant had passed to his room, Whitlock and his wife retired, and went to sleep.

At about 10 o'clock, or shortly thereafter, they were awakened by the defendant, from the outside of their bedroom window, which was at the time open, having a screen in it, calling to Whitlock, saying, " Henry, there is a couple of cows in the corn."   Whitlock, and his wife at once arose, Mrs. Whitlock lighting a lamp, while he put on his clothes, lighted a lantern, and started out, she returning to her bed.   In the roadway they were met by a neighbor, who saluted the defendant, who was in advance of Whitlock, with the word " Hello," and passed on, the defendant replying with the same expression.   Mrs. Whitlock remained lying upon the bed, watching the light of the lamp, which was in the dining room.   Within a very few minutes after her husband had left the house, the light suddenly went out, leaving the house in darkness. Hearing no noise, and thinking that her husband had left the door open, and that the light had been extinguished by a gust of wind, she arose, passed through the doorway of her bedroom, and was at once seized by the defendant, who had returned to the house, and divested himself of his clothing, with the exception of his shirt.   She screamed, and he asked her what was the matter.   She recognizing his voice, said, " How you scared me."   He then had his hands on her shoulders, pushing her backward toward the bed. She then asked him what he was trying to do, and he replied, telling her his purpose, and remarked, "I have been crazy over you all summer."   A violent struggle then ensued, in which he forced her back upon the bed, placed his hand over her mouth, choked her into insensibility, and criminally assaulted her.   During the progress of the struggle, she slipped his hand from her mouth, and called for Henry, her husband.   The defendant then said that " he had killed him, and that he was going to kill himself ; but if she would lie still, and let him, he would spare her."   A second time she succeeded in getting his hand from her mouth and screamed, "Henry !"   He then told her if she screamed again, he would kill her.   He then choked her so violently that she lost consciousness.   On her recovering consciousness, the defendant was standing upon the floor in front of the bed.   She made a spring to get up, but the defendant caught her, and again pushed her back on the bed, threw himself on her, and again attempted to assault her.   He arose, and sat upon the edge of the bed.   She again

attempted to arise; bnt he caught hold of her, and held her around the body, on the edge of the bed. She asked him to let her go, to which he replied : " What did I kill Henry for? He has always been a good friend to me, and there is nothing left for me but the chair." She then begged him to let her go just to the door to get a breath ; that she was choking. He led her to the door, which was open, but which had a screen door hooked on the inside. As she got near the door she made a desperate effort to get away from him, but he held her, and pushed her back into the bedroom again. He sat down upon the edge of the bed while holding her, and again said, " What did I kill Henry for? " She replied : " But maybe you haven't killed him. Let me go and see. Maybe I can do something for him." He that said: " There is no use. When he bent down to go under the bars, I struck him on the head with the axe, and threw him over the fence." She finally prevailed upon him to leave, and when he had done so she slipped a wrapper over her nightdress, pulled on her shoes without stockings, and ran to her neighbors for help. The examination which was made by the neighbors shortly afterwards disclosed the body of Whitlock lying inside of the barway by the side of the fence. It lay upon its back, legs and arms out straight, with an axe and hat but a few feet away. In the back of the head was a deep gash, penetrating through the skull and brain. There was a pool of blood under the bars, and they were spattered with blood and brain tissue. The upper and lower bars were in place. The central bar was broken down in the center. The ground descended towards the roadway, and blood had run down the wheel tracks into the roadway, doubtless washed there by the rain which had fallen during the intervening time. An examination of the cornfield showed that no cows had been in the corn. About nine days before the homicide, the defendant, in conversation with a neighbor by the name of Secor, and in the presence of his brother-in-law, Walker, spoke of his liking Mr. and Mrs. Whitlock very much, and said that he " would like to sleep with her one night, and if I could I would be willing to roll in my grave." After leaving Mrs. Whitlock on the night of the homicide, the defendant went to the barn of an acquaintance for whom he had formerly worked, buried himself in the haymow, and there remained until the eve-

ning of the 8th, when he made his presence known, seeking food and water ; and he was shortly thereafter placed under arrest.

We have thus given a brief summary of the evidence produced in behalf of the people, none of which is controverted. It amply justifies the finding that the defendant lured the deceased from his bedchamber under the false pretenses that the cows were in the corn ; that he proceeded in advance of him through the barway where the central bar was broken, and where it was necessary to stoop in order to pass between the upper and lower bars ; that there, with an ax secured for the purpose, he struck the fatal blow as Whitlock was bending his head under the bar. That this act was done with deliberation and premeditation there is no room for doubt. That it was done for the purpose of gaining possession of Mrs. Whitlock is also evident. The defense interposed was that of insanity. It is claimed that he was suffering from the disease known as " larval epilepsy." The evidence tends to show that in his boyhood days he was rather quiet and retiring, caring but little for the company of other boys, and frequently refusing to join with them in their plays ; but he would occasionally join them, at which times he would play with great vigor, and with some harshness. From early infancy he appears to have been troubled with walking in his sleep, from which he would awake uttering a sudden scream. At other times he would walk or run about the house, screeching or mumbling to himself, with staring eyes. For a number of years he lived with his grandparents, who on such occasions often aroused him by the application of cold water. At times his limbs and body would twitch and tremble. He had seasons of depression, when he would sit for hours holding his head upon his hands, heedless of the conversation addressed to him. He occasionally had headaches, and at one time was caught in the act of self-abuse. When between nine and ten years of age he was struck a blow on the head with a hammer by his little brother, who was four or five years of age. Later on he fell from a horse, striking on his head and shoulders, which rendered him unconscious for a time. When twelve years of age, he arose one night, hitched a horse to his grandfather's sleigh, and drove to his mother's, about four miles away, where he arrived about four o'clock in the morning. He hallooed, and awakened his mother.

She called him to come in, but he remained sitting in the sleigh until she went out, shook him, and brought him in. He had on his trousers, his grandfather's boots, his grandfather's overcoat, and one mitten. He was nearly frozen, and was so wild and excited after he was taken into the house that a physician was sent for. Whether he had been asleep during the entire journey, or how long he had remained in that condition, does not clearly appear from the narration of the event given by his mother. It does, however, appear that he afterwards had no recollection of this transaction. In his early manhood he worked upon the canal, about railroads, and for five years served in the regular army as a soldier. In 1887 he was married, and lived with his wife several years. She then left him, as she alleges, because of his conduct towards her, and because of her belief that he was not sane. It appears that during their married life he continued from time to time to rise in his sleep, talk, and on some occasions yell. They had quarrels, in which he became mad and violent, even to the extent of breaking and tearing some of the household goods and furniture. He worked with horses considerably, and was often known, in his sleep thereafter, to yell and swear at his horses. For quite a time he worked in connection with a threshing machine, and on nights following such work he has been known to give orders in his sleep with reference to the measuring of the grain and caring for the straw. It appears that his mother was fifty-nine years of age; that she was once a nurse, living in the West; and that, in 1883 or 1884 she was taken sick in Iowa, and was removed by the public authorities to the poor farm of Lucas county, where she was cared for for some time. During this period she would tell her family troubles in a serious manner, and suddenly break into a laugh, or bite her lips. She picked at her clothing and hair, would look wild, and then suddenly turn away, and become hilarious. She was, doubtless, disarranged in her mind at this time, but subsequently recovered. She returned East, and was a witness upon the trial of this action. Four doctors, including Dr. Sefton and Dr. McDonald, who were both medical experts upon diseases of the mind, gave it as their opinion that he was insane, and not responsible for his acts. On the other hand, many of his neighbors and acquaintances for years were

placed upon the stand, and testified that they never saw anything. about his conduct which impressed them as irrational; and an equal number of physicians have given it as their opinion that at the time of the homicide he was sane.

It is quite evident that this man's intellect was of a low order, and that he did not possess a well-balanced mind. That his disposition was disagreeable, and his meditations far from pure, we do not doubt. Had he possessed a strong, vigorous well-balanced mind, this crime would not have been committed. Such a person would have controlled his passions, and would not have yielded to desires involving acts of such cruelty and disgust. It, however, is a fact, disclosed by our criminal records, that a large percentage of the crimes of this character is committed through motives similar to those which actuated the defendant in this case. It is not every weak or disordered mind that is excused from the consequences of crime. It is only those who, at the time of committing the criminal act, were laboring under such a defect of reason as either not to know the nature and quality of the act they were doing, or not to know that the act was wrong. Pen. Code, § 21. The evidence presented a question which it was the duty of the court to submit to the jury. It was the province of that tribunal to weigh and consider it in all its bearings, and to determine the mental condition of the accused. That determination has been made. We have carefully read and considered the evidence, and our conclusion is that the evidence is of such a character that we ought not to interfere with the verdict rendered.

This defendant, as we have seen, was physically a strong, healthy man. He was shown to be a good farm laborer. He lured the deceased from his house on through the barway, where he had preceded him with ax in hand, standing ready to deliver the fatal blow as soon as the head of his victim should bow under the bars. He appears to have known perfectly what he was doing, and to have remembered the transaction; for he subsequently returned to the frightened wife, and told her what he had done and how he had done it; and when she tried to persuade him to let her go and see if she could not do something for her husband, he told her it was of no use, evidently fully understanding the nature and the quality of his act. That he knew the act was wrong is also

apparent from his subsequent statements. He knew that the crime was punishable with death. He said there was nothing left for him but the chair. He had done the deed for a purpose. The purpose he made known to her; and when he was asked to go away, he refused, saying: "What did I kill Henry for?" With reference to insanity being hereditary in his family, it was doubtless true that his mother was disordered in mind during the period hereinbefore alluded to. There is, however, no evidence in the case showing that she was disordered at a former or subsequent period. She was not shown to have suffered from epilepsy, or any of the disorders similar to those which it is claimed were traceable in the defendant. It occurred at a period in her life in which an affection of the mind in females is not uncommon.

Before entering upon the impaneling of the jurors, the defendant interposed a challenge to the original and the additional panel of jurors drawn for the term, upon the ground that the sheriff had intentionally omitted to summon certain of the jurors, naming them, who had been drawn to attend that term of court. Also upon the ground that the drawing of the jurors by the clerk did not take place more than fourteen days before the day appointed for that term of court, and that notices of such drawing were not published by the clerk six days before the day designated. The district attorney denied the challenge interposed, and thereupon the court entered upon a trial of the questions presented, from which it appeared that the drawing of the jurors by the county clerk took place on the second day of March; that the notice was published for two weeks successively, commencing on the twelfth day of February, 1896; that the court was appointed for the sixteenth day of March; and that the sheriff had summoned the jurors drawn to attend at that term of court by mailing a notice thereof to them, inclosing a card to be signed and returned, admitting the service of the notice. The proceedings for the formation of a trial jury in criminal cases are prescribed by the Code of Procedure (§ 1048): "The sheriff must, at least six days before the day appointed for holding the term, serve, upon each person named in the list, personally, or by leaving it at his residence, with a person of proper age and discretion, a written notice to attend the term. He must file the list with the clerk of the court,

at or before the opening of the term, with a return, indorsed there-upon, or annexed thereto, under his hand, naming each person notified, and specifying the manner in which he was notified." It is very clear that the sheriff did not conform to these provisions in notifying the persons who had been drawn as jurors to attend at that term of court. Instead of following the form of service provided by the statute, he adopted another form of his own device, which the statute did not recognize, and which left the court without the power to compel the attendance of a single juror. But we are inclined to the view that in this case no harm was done, for the reason that all of the jurors drawn, who were quali-fied to sit, personally appeared in court at the time appointed. It is true that out of the first panel of thirty-six jurors which were drawn but thirty-two appeared. It was shown, however, that two of the persons were dead, that one had removed to another county, and the other to another state. As to the additional panel of 100 jurors which had been drawn, all appeared except five. One was dead, two were so sick as to be unable to attend court, which was shown from the personal examination of a doctor; one was a resident of another county, and the other was so deaf as to be unable to hear ordinary conversation; and their attendance was excused by the trial judge. The Code of Criminal Procedure (§ 362) provides that "a challenge to the panel can be founded only on a material departure, to the prejudice of the defendant, from the forms prescribed by the Code of Civil Procedure, in respect to the drawing and return of the jury, or on the intentional omission of the sheriff to summon one or more of the jurors drawn." It is thus evident that no right of the defendant was invaded. He was deprived of no juror whose attendance could have been compelled had the service been in accordance with the requirements of the Code. We consequently do not now deem it necessary to determine what the effect upon the judgment would have been had it appeared that qualified jurors refused to attend at the term of court, upon the ground that they were not properly served.

Was the drawing of the panel of jurors within the time pre-scribed by the Code? As we have seen, the panel was drawn on the second day of March for a term of court appointed to be held

on the sixteenth day of March. If, in counting the time, we could exclude the day upon which the drawing took place, and count the day upon which the court was appointed, it is evident that the drawing would have been in time. But section 1042 of the Code of Civil procedure provides that "on a day designated by the county clerk, not less than fourteen nor more than twenty days before the day appointed for holding each trial term, * * * the clerk of the county in which the term is to be held * * * must draw the names of thirty-six persons, * * * to serve as trial jurors at the term." It will be observed that under the provisions of this section the drawing must be not less than fourteen days before the day appointed for the term of court. That day, therefore, must be excluded in the counting. It thus remains to be seen whether the day upon which the drawing took place can be counted. Section 788 of the Code of Civil Procedure was repealed by chapter 677 of the Laws of 1892, and that chapter, known as the "Statutory Construction Law," was substituted in its place. Section 27, among other things, provides that: "A number of days specified as a period from a certain day, within which or after or before which an act is authorized or required to be done means such number of calendar days exclusive of the calendar day from which the reckoning is made. * * * In computing any specified number of days, weeks or months from a specified event, the day upon which the event happens is deemed the day from which the reckoning is made. The day from which any specified number of days, weeks or months of time is reckoned shall be excluded in making the reckoning." There is some conflict in the courts below with reference to the construction of this chapter. Bank v. Bayles, 17 App. Div. 596, 45 N. Y. Supp. 305, criticising Aultman & Taylor Co. v. Syme, 91 Hun, 632, 36 N. Y. Supp. 528. The latter case was appealed to this court, but the appeal was dismissed (148 N. Y. 755, 43 N. E. 985) for the reason that we did not deem the order appealable or the question here presented properly raised for our determination. Our examination of the statutory construction act discloses no intention on the part of the legislature to materially change the existing rule for the computation of time, except, perhaps, to more definitely fix the event from which the count is to be made. It will be observed, upon refer-

ring to the statute, that the day to be excluded in making the° reckoning is the specified event, from which the days, weeks, or months are to be counted. In this case the specified event from which the count is to be made is the day appointed for the commencement of the term of court. It will be remembered that the drawing must take place not less than fourteen days before the day appointed for the holding of the term, so it is from that day that the fourteen days are to be counted. That day, under the construction act, must, therefore, be the day excluded; and in making the count back from that time the day on which the required act was performed, we think, may properly be included. It follows that the challenge of the panel was properly overruled.

An exception was taken to the testimony of a witness to the effect that a certain spot indicated by him upon the lantern used on the night of the homicide was blood. He testified that he saw the lantern on the night or morning in question; had his attention called to it at that time; and that then the blood was fresh. He did not undertake to state whether it was human blood or not. We think the ruling of the court was proper. The witness but described what he saw upon the lantern, and indicated the spot as it appeared upon the lantern when exhibited in court. It does not require an expert to distinguish blood from other things or objects with which every person is familiar.

A number of exceptions were taken to the testimony, in which the defendant was spoken of as being intoxicated on a certain occasion, and in which, on various occasions, his acts were spoken of by witnesses as impressing them as rational. These questions we do not deem it necessary to discuss in detail All of the questions raised by the exceptions referred to have recently been considered by us in the cases of People v. Strait, 148 N. Y. 566, 42 N. E. 1045, and People v. Youngs, 151 N. Y. 210, 45 N. E. 460. The rulings made were in accordance with the rule recognized in those cases, and are sustained by them.

'The only serious exception to which our attention has been called appears in the testimony of the witnesses Baker and Meade, in which they were permitted to contradict the testimony of the defendant's wife to the effect that she never told either of the witnesses, Baker or Meade, that she never knew of any insanity on

the part of any member of her husband's family. The difficulty with this evidence is that it was called out by the people, and not by the defendant. In her direct examination her attention had been directed to the condition of her husband, and no mention had been made of the condition of any member of his family. The district attorney, therefore, in proceeding to examine her with reference to her statements as to the condition of her husband's family, entered upon a new field, making her his own witness. The defendant was not responsible for or bound by such statements, and the district attorney could not properly lay the foundation for contradicting her upon that subject. We therefore concede the incompetency of this evidence. But was there such an error as to require a new trial? In the first place, the evidence of Baker was objected to "as incompetent, upon the grounds before stated." The grounds before stated were: First, that the witness was the wife of the defendant, and was incompetent to testify against him; and, second, the witness' attention had not been called specifically to the inquiry. Neither of these positions was well taken. The evidence of Meade, which followed the discussion and ruling upon the evidence of Baker, was objected to as incompetent and improper. In this objection the attention of the court was not called to the real grounds upon which the evidence was incompetent. It is true that we have the power to order a new trial for the reception of incompetent evidence, even though there be no exception taken; but this is only done when justice so requires. Code Cr. Proc. § 528. This power is exercised only in cases where manifest injustice has been done, and where it is apparent that a different result might have been reached. People v. Kelly, 113 N. Y. 647, 21 N. E. 122; People v. Cignarale, 110 N. Y. 23, 17 N. E. 135; People v. Fish, 125 N. Y. 136, 144, 26 N. E. 319.

Under section 542 of the Code of Criminal Procedure, we are required to give judgment without regard to technical errors or defects which do not affect the substantial rights of the parties. There is no claim or pretense that there was insanity on the part of any member of the defendant's family other than his mother. The evidence with reference to her condition was not in any manner controverted. It came from witnesses residing in the

West, so far as we can learn, entirely impartial, and it became the duty of the court and the jurors to consider her condition as established by the testimony of the witnesses. The defendant's wife lived in Rhode Island. The sickness of his mother occurred in the state of Iowa. It is not pretended that she ever had any personal knowledge of the condition of her mother-in-law. We are, therefore, of the opinion that no harm resulted to the defendant from the testimony in question. The judgment of conviction should be affirmed.

All concur, except GRAY, J., absent.

Judgment affirmed.