THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
MARY FARMER, Appellant.

Murder — sufficiency of evidence — defense of insanity — ques-
tions for jury — motion to set aside indictment — voluntary
waiver of protection of section 835 of Code of Civil Procedure —
confessions — preliminary examination — harmless exclusion of
exidence.

Evidence on appeal by defendant from conviction of the crime of mur-
der in the first degree examined.  *Held,* while no person saw the defend-
ant in the actual commission of the homicide, the evidence is such in
connection with all of the surrounding circumstances, that the inference
of her guilt is irresistible.  It was clearly a deliberate and intentional
act with no circumstances that point to justification or that mitigate
its heinousness.

The question whether the defendant at the time of the homicide was
laboring under such a defect of reason as not to know the nature and
quality of the act, or to appreciate the wrong of willfully taking
another's life, is like every other question of fact to be determined by
the jury.  Unless the verdict of the jury is against the weight of the
evidence, the conclusion against defendant upon that as well as upon
every other issue in the case must be sustained.

The jury is not required to pass upon the quality and strength of intellect
or moral perceptions of a person on trial upon the question of insanity,
except as such questions affect the general question of the defendant's
knowledge, at the time of the homicide, of the nature and quality of the
act.  A weak or even a disordered mind is not excused from the
consequences of crime.

A grand jury drawn by virtue of section 235 of the Code of Criminal
Procedure, which provides : " If a crime be committed during the sit-
ting of the court, after the discharge of the grand jury, the court may,
in its discretion, direct an order to be entered that the sheriff summon
another grand jury, and the same shall be summoned in the manner
prescribed for grand juries in general," is " another grand jury."  The
provisions of the Code of Criminal Procedure relating to the number of
days that the order shall be entered in the county clerk's office prior to
the term for which the jury is ordered, and also the statutory provisions
relating to the number of days that the jury shall be drawn prior to the
holding of the term for which they are drawn are inapplicable.

The Code of Criminal Procedure (§ 313) provides the grounds on which an
indictment may be set aside on motion.  Where no objection was
made to the panel of grand jurors for the causes prescribed by section
238 of said Code, the defendant's constitutional rights are not invaded

by the denial of a motion to set aside an indictment when the motion was made subsequent to the discharge of the grand jury, and related to the indictment and work of the grand jury and not to the grand jury itself.

Defendant, by an admission to another of what she had stated to an attorney relating to the transaction, waived the protection of section 835 of the Code of Civil Procedure, at least to the extent of such voluntary disclosure. That section was not intended to prohibit the disclosure of a communication so far as such communication is necessary for a public officer to act in his official capacity; further, the seal of personal confidence cannot be used to cover a transaction which is in itself a crime.

A request for the preliminary examination of a witness, before he testifies to confessions alleged to have been made by a defendant, is too late after the confessions had already been heard by the jury and it appeared that they were made without threats or promises of any kind.

When a crime is fully proven, the evidence being practically undisputed and altogether conclusive, the nature and extent of the motive is unimportant. When evidence is excluded which bears only slightly upon the defendant's motive for committing the crime, and it is apparent that no harm resulted to the defendant by reason thereof, its rejection does not furnish ground for reversal.

(Argued January 19, 1909; decided February 9, 1909.)

APPEAL from a judgment of the Supreme Court, rendered June 19, 1908, at a Trial Term for the county of Jefferson, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Edmund R. Wilcox* for appellant. The court erred in refusing to admit the testimony of James A. Ward as to his conversation with Mrs. Brennan on or about the 15th day of January, 1908, in regard to the giving of the deeds in question. (21 Cyc. 924, 925; *Gibney* v. *Nearchay,* 34 N. Y. 301; *Moore* v. *Hamilton,* 44 N. Y. 667; *Lyon* v. *Ricker,* 141 N. Y. 225.) The court erred in refusing to permit the defendant to exercise the right of preliminary examination of a witness for the purpose of showing that an alleged confession was improper and involuntary. (Code Cr. Pro. § 395; *People* v. *White,* 176 N. Y. 331; *Cayuga Co.*

*Suprs.* v. *State,* 153 N. Y. 271; *Coats* v. *People,* 22 N. Y. 245; *People* v. *Fox,* 121 N. Y. 449; *People* v. *Fiori,* 123 App. Div. 174.) The court erred in permitting an attorney to testify to his transactions with the defendant, who was his client. (Code Civ. Pro. § 835.) The court erred in not setting aside the indictment on the ground that the body of men which found the indictment was not a grand jury of the county of Jefferson. (Code Cr. Pro. §§ 230, 235, 238.) On the whole case, in reference to insanity, the People failed to show a preponderance of evidence, and the evidence for the prosecution did not rebut the presumption of insanity raised by the defense. (*People* v. *Nino,* 149 N. Y. 317.)

*Fred B. Pitcher, District Attorney,* for respondent. The question of the defendant's sanity was for the jury. (*People* v. *Ferraro,* 161 N. Y. 365; *People* v. *Burgess,* 153 N. Y. 561; *People* v. *McElwaine,* 125 N. Y. 596; *People* v. *Kerrigan,* 147 N. Y. 210.) The statements of the deceased made at a time remote from the homicide were properly excluded. (*Maine* v. *People,* 9 Hun, 119; *People* v. *Davis,* 56 N. Y. 95; Wigmore on Ev. § 1765; *State* v. *Delong,* 12 Iowa, 453; *State* v. *Emigh,* 18 Iowa, 122; *T. Ins. Co.* v. *Mosley,* 8 Wall. 397.) The grand jury was properly drawn and constituted. (Code Cr. Pro. §§ 235, 312; *People* v. *Petrea,* 92 N. Y. 128.) It was not error for the court to refuse the request of pefendant's counsel for a preliminary examination of a witness called to testify as to an alleged confession. (Code Cr. Pro. § 542; *People* v. *Mayer,* 162 N. Y. 357; *People* v. *Zigouras,* 163 N. Y. 250; *People* v. *Brasch,* 193 N. Y. 46.) The evidence of the witness Burns was properly received. (*Bank of Utica* v. *Mersereau,* 3 Barb. Ch. 528; *People* v. *Bloom,* 193 N. Y. 1.)

Chase, J. The homicide of Sarah Brennan, for which the defendant has been convicted, was committed in the village of Brownville, Jefferson county, about four miles from the city of Watertown, on Thursday, April 23, 1908. The body of

the deceased was found on Monday, April 27, in a trunk owned by and in the possession of the defendant. The defendant under her general plea of not guilty attempted at the trial to establish that she was insane and wholly irresponsible for any acts relating to the homicide that might be found against her. It is necessary for us to state briefly the principal facts disclosed upon the trial to show upon what evidence the jury acted, and also from which to determine the effect of certain rulings of the court that are now urged as reversible error by the defendant's counsel.

The defendant married James D. Farmer at Buffalo in the fall of 1904. Early in 1905 they came to Brownville, it being his native place. After remaining in Brownville for two or three months at one of his numerous relatives, the defendant commenced keeping a boarding house in an adjoining village. Her boarding house venture was a failure, and on Decoration Day in 1907 she moved with her husband into the easterly part of an old building formerly used as a hotel in a part of Brownville known as Paddy Hill.

Sarah Brennan, the deceased, lived with her husband, Patrick, in a house about eighty feet from and east of said old hotel. The Brennans had lived in the same house for more than twenty years and the title to the house and about five acres of land therewith was in Mrs. Brennan. At that time the defendant's household effects were subject to a chattel mortgage given by her and she owed numerous open accounts and one or more judgments which had been obtained against her. A few weeks after she moved to Paddy Hill she became a frequent caller at the Brennans and Mrs. Brennan occasionally called upon the defendant. Mrs. Brennan kept her deed, an abstract of her title, fire and life insurance papers and a savings bank book in a black oilcloth pocket book or envelope in a tin box in her bedroom.

On October 31, 1907, the defendant appeared alone at the office of a lawyer in Watertown. She there produced the deed of said property to Mrs. Brennan and had a deed prepared therefrom to James D. Farmer, her husband, and also

a bill of sale of the personal property and provisions in the Brennan house and, stating that she was Mrs. Brennan, signed both papers using the name " Sarah Brennan," and as " Sarah Brennan" acknowledged the execution of the deed before the lawyer who was a notary. On November 9 defendant gave the deed with two dollars to her husband's sister who was going to Watertown and requested her to have it recorded. Defendant said she had paid twelve hundred dollars for it. Her sister-in-law replied : " The woman must have been crazy to sell the property for Twelve hundred dollars," and the defendant said : " I don't care whether she was crazy or not. She sold it to me. I have got the property." On her way to Watertown the sister-in-law examined the deed and found the name of the lawyer before whom it was acknowledged and went to the office of such lawyer, but what conversation she had with him does not appear. She left that office and telephoned to her brother and then waited for him. When he arrived and after some conversation, which does not appear, they went to the county clerk's office and left the deed for record. When the defendant gave the deed to her sister-in-law she told her that she had a bill of sale of the personal property and the sister-in-law as a witness testified, " She gave me to understand that Mrs. Brennan was about to leave Mr. Brennan."

The deed was returned from the clerk's office to James D. Farmer November 26. On January 7, 1908, the defendant and her husband went to the office of a lawyer in Watertown, but not to the one who had drawn the deed on October 31, and had a deed drawn to Peter J. Farmer, a son who had been born to them the preceding September 2. That deed was duly executed by the defendant and her husband and on the same day duly recorded. On January 11, 1908, it was mailed from the clerk's office to the infant, Peter.

The insurance on the property, real and personal, expired February 23 and it was renewed by Sarah Brennan. The defendant was in the Brennan house early in April and heard a conversation about Mr. Brennan paying for the renewal of

the insurance but she did not say anything about the property having been deeded to her infant son. Patrick Brennan says he was told that the defendant had a deed of the place and that he spoke to his wife about it and believed what she said although what she said is not disclosed. In December a collector for the mortgagees of the chattel property called on the defendant and she told him that she had purchased the Brennan property "and she was soon going to occupy it, as Mrs. Brennan was going to leave her husband and go west." In the latter part of the winter she told a person then a tenant of a part of said old hotel that she had bought the Brennan property and had paid twelve hundred dollars cash for it and that she was going to move. She did not say when she was going to move. She asked a neighbor early in April if she had heard that she had bought the Brennan place. The neighbor replied: " Yes, but I did not believe it, that I had heard that Mr. and Mrs. Brennan would not sell it, but that she had been offered over Two thousand dollars and refused it."

Mrs. Brennan had employed a dentist in Watertown and was having work done by him in April. On April 4 the defendant called with Mrs. Brennan at the dentist's and on Tuesday, April 21, the defendant called again and agreed upon certain work for herself to cost $45 and made an appointment for the next day and agreed as required by the dentist to pay the $45 in advance. Mrs. Brennan was at the dentist's Wednesday morning and made an appointment for herself on Thursday at one o'clock. After Mrs. Brennan left the dentist's on Wednesday the defendant called too early for her appointment. She went out when told of her mistake but did not return.

On April 23 Mrs. Brennan prepared breakfast for herself and husband at six o'clock. He left for his work. which at that time required him on duty from seven A. M. to three P. M., and she told him that she was going to the dentist's at Watertown. Between nine and ten o'clock that morning. Mrs. Brennan was seen to leave her house and enter the

defendant's house.  She was dressed for the street.  Early
that morning the defendant took her baby to the house of a
neighbor and left it to be cared for while (as she stated) she
went up town.

Between the time that the defendant left her baby at the
neighbor's and Mrs. Brennan going to the defendant's house,
the defendant passed back and forth between the two houses
several times.  She was also seen passing between the houses
three times between eleven and twelve o'clock that morning.
Between twelve and one o'clock she called for and took the
baby and at the same time arranged that a young daughter of
the neighbor come to her house and 'further assist her in
caring for the baby.

About one o'clock the young girl went to the defendant's
as promised and found the defendant and her husband taking
lunch.  She heard a conversation between them.  Mr. Farmer
wanted twenty-five cents to get some beer which the defend-
ant refused in language that indicates her low moral standards.
He uttered an oath and took some keys and told her to take
them and said he would go to Doran's to his work and she
replied that she didn't care where he went.  Doran's was the
home of Farmer's sister and he had been working there with
others relaying a walk.  Soon after Farmer left, the defendant
went in the direction of Doran's and in a few minutes returned
and went into the Brennan house.  She returned to her house
and then sent the young girl to Doran's to tell her husband
to come right home that he was wanted.  The girl went and
told Farmer, but he would not return.

Defendant then took some folded papers from a dresser and
went to Doran's, arriving there a few minutes before two
o'clock, and said to her husband : " There is the keys of your
house and your money or your rent.  *  *  *  You go to
the mill and tell Patsy that his wife is gone and he has no
home."  Her husband refused to go and said it would be
time enough when Patsy got home.  She then asked Doran
to help her husband move their things to the Brennan house
and that was refused.  Defendant had a package with her

17

and said that she had her deeds and insurance papers and she then asked Mrs. Doran to keep twelve dollars for her and she left it with her.

She then returned to her house and said to the young girl that she wanted to clean up her back room. She was engaged cleaning up the back room for some time and then carried a bundle of clothes out of a bedroom into the back room. During the time that she was cleaning the back room she had the door leading into the room closed. She went to Doran's for her supper and walked up and down the room and said : "I am afraid that may be Mr. Brennan will burn up the house to-night." Brennan returned from his work at fifteen minutes to four and found the house and barn locked. He looked for the keys where it was Mrs. Brennan's custom to leave them when she was away but he could not find them. He pulled the staple by which the barn door was fastened and proceeded to remove a storm door and windows from his house and put them in the barn. He heard a voice and looked around to the west and saw Farmer standing there who said : "Brennan, don't you know I bought this place?" The subsequent conversation is not disclosed. The defendant was walking up and down in front of the property and so far as appears had not dressed to go to Watertown at any time that day. Brennan with the aid of a ladder went through a window in the second story of the building and occupied the house that night. He went to work Friday morning.

The defendant on Friday morning went to Doran's and said : "I left a package here last night." She then took Mrs. Brennan's black oilcloth pocket book or envelope from where it had been hidden in a chair and obtained the money she left with Mrs. Doran and soon after went with her husband to Watertown. They went to the lawyer who drew the last deed and had him prepare a notice directed to Patrick Brennan, which Farmer signed, and in which he described the deed and bill of sale of October 31, and therein further said : "I thereupon became and now am the owner of said property, that your wife has recently delivered to me the

keys and the possession of said house and property ; " and also further said : " I hereby notify and require you to stay away, remain away and keep out of said house and off said premises from now on." Upon leaving the lawyer's office the defendant went to the office of the insurance agent who renewed the insurance for Sarah Brennan on February 23 and produced the policy and asked to have it changed so as to recognize Peter J. Farmer as the owner, and it was done. The notice was delivered to a constable to serve on Brennan and it was served upon him that night.

Brennan went to Watertown Friday night and made inquiry among his friends about his wife and returned to the house but left in the usual manner Saturday morning. He returned to the house Saturday morning a short time after leaving it and found the defendant and her husband in the house preparing their breakfast. The defendant said to Brennan : " As long as you use me and James well you can come here and stay as long as you are in a mind to and your board wont cost you a cent." Brennan then went to the district attorney's office and also engaged a constable to aid in finding his wife.

The defendant and her husband, with others that were solely induced by free access to ale which she furnished, commenced moving their goods to the Brennan house. In what is termed the back room was a large trunk which the defendant asked one of the men to tie with a rope. The defendant lifted the ends of the trunk while a clothes line was wrapped around and across the trunk three times and tied. The defendant then said that " she had stuff in there she didn't want broken " and had two men carry it to the Brennan house while she walked along and directed where it should be placed in a back room of that house, and other things were piled upon it. She then at the Brennan house proceeded to wash certain clothes and hang them in the back yard.

The constable employed by Brennan came to the house and asked the defendant where Mrs. Brennan was. The defendant replied : " She has gone to Watertown, I think, to get her

teeth fixed." She also said that Mrs. Brennan was going to move to Watertown, and that she had bought the house and furniture. The constable persisted in questioning the defendant, and she then said of Mrs. Brennan that " she had gone to Duluth. She had left Patsy  *  *  *  She had me — told me to send some things up to 16 Griffin Street." The defendant also sent for the parish priest and told him a similar story, and had him bless the house.

On Monday, April 27, the sheriff, with several others, went to the Brennan house and inquired of the defendant about Mrs. Brennan. The defendant said : " The last time she saw her she went over towards the street car track and said she was going away." The defendant made other statements, and she was asked to produce the deeds, and after some delay she went to the cradle and pulled the black oilcloth envelope therefrom and produced the two deeds and the insurance policy. She was asked if the signature on the first deed was Mrs. Brennan's and she said it was. The sheriff then told her that he had come to search the house, and proceeded to do so. Inquiry was made in regard to the trunk tied with a clothes line, and the defendant denied that she owned it, and said it belonged to her husband, and he with an oath said it did not belong to him. The rope was removed and the lock broken, and in the trunk the sheriff found the body of Mrs. Brennan fully dressed. She had on a cloak and a boa tied loosely about the neck.

The defendant and her husband were then arrested. The defendant denied all knowledge of the homicide. The sheriff said to her that she knew all about it, and she was further urged to tell the truth. The defendant asked : " Now, if I have to be taken away can I have my baby." She was told that if she were taken away the baby would go with her.

The defendant then stated that Mrs. Brennan was in her house and stood by the door looking out of the window and that she stepped up behind her and hit her with an axe. Subsequently she said to the sheriff that she had not told the

truth, that "Jim" did it. She said Mrs. Brennan had been with her up town and that when they came back "Jim" was angry because she had left her baby at a neighbor's. She said she then went for the baby and on her return "Jim" was just putting the body in the trunk. The defendant was taken to the jail and at the jail she was asked about the deeds and said that she became very friendly with Mrs. Brennan; that Mrs. Brennan became jealous of a neighbor and then said that she would deed the property over to her and that she need not pay for it; that they went to Watertown and had the deed signed and that as Mrs. Brennan did not have her glasses with her she signed it for her; that afterwards there was considerable talk about the deed and it was made to the boy and that Mrs. Brennan talked about going away and leaving Patsy. She said she told her husband she paid twelve hundred dollars for the property and that she told Mrs. Brennan that after a while she could come back and stay with them and it would not cost her anything.

At the jail she further said that Mrs. Brennan came to her house and said she was not feeling very well. She said that Mrs. Brennan said: "She would give anything if she would take that old axe that laid there and knock her brains out and I said all right, here she goes, I takes the axe and kills her." She said then she put the body in the trunk, washed up the things that were bloody and burned up the things from which she could not remove the blood. She said Mrs. Brennan was sitting down in a chair by the window when she killed her. Subsequently human blood spots or stains were found on the casing of a door leading from the room known as the sitting room in the defendant's house, also on a towel, matting, and on two waists and a skirt that were included among the things that defendant was washing on Saturday at the Brennan house. On a sleeve of one of the waists a small piece of human flesh was found. The body of Mrs. Brennan was in no way bruised or injured, but her face and head were horribly mutilated by many blows from a blunt instrument, the turban hat which she wore was missing, but the burned

wire framework of a hat similar to the one she wore was found in the defendant's stove.

Very little, if any, testimony was offered on behalf of the defendant to contradict the testimony produced by the People, or to avoid the necessary conclusion therefrom that the defendant is guilty of the crime. Her counsel urges that there must have been a fight between the defendant and Mrs. Brennan which terminated by the defendant, while in anger, striking the blows which caused Mrs. Brennan's death, but such an inference cannot reasonably be drawn from anything disclosed by the record, and it is substantially contradicted by the condition of the deceased's body and the clothing thereon, which indicate that she was killed without warning, soon after her entrance at the defendant's house and while her wraps remained in a condition in which they were in when she arrived ready to proceed to Watertown. The principal effort of the counsel on behalf of the defendant was to show that she was not responsible for her acts.

He produced several witnesses who testified to actions and statements by the defendant which he insists were irrational. The parish priest testified that she came to him soon after her arrival at Brownville and asked to have him announce a social at her house for the benefit of the church, and promised not to have dancing thereat, and subsequently violated her promise; that she came to him from time to time to borrow money and to discuss the purchase of certain real property for boarding house purposes; that she talked with him about the time of the birth of her child, and on the Saturday and Monday after the homicide, the details of which he gave before the jury, but he was unwilling to say that her actions and statements impressed him as irrational. He simply characterized them as suspicious and strange, which characterizations were subsequently stricken from the record. One witness testified to her purchasing a quantity of frozen beef which she left near the kitchen stove until the frost was removed therefrom and then returned it as spoiled meat, and that at one time she wanted to purchase a case of baking pow-

der, and said that these acts impressed him as being irrational. Another witness testified that she at one time purchased three or four wash tubs, three dust pans and more than one mop, and although this was at a time when she was keeping a boarding house he characterized such acts as irrational. Some acts were related and statements given of what occurred within a few days before and after the birth of her child which were also characterized as irrational. Other witnesses testified to seeing her talking to herself, and two witnesses were produced as experts, one her family physician and the other a physician temporarily residing in the locality.

The defendant came to this country from Ireland about the year 1900, and worked as a domestic for about a year in Binghamton, and subsequently until her marriage at different places in Buffalo. There is no further evidence of her personal and family history other than the statement made by her to the two physicians produced as witnesses in her behalf at the trial. Her statement to such physicians was given with great detail, and if her statement to them is true her ancestors were singularly unnatural and degraded. According to her statement they were criminal, insane, epileptic and degenerate. She says that she had fits until she was twelve years of age. The physicians sworn in her behalf testified to their examination of her and that they found all of her senses defective, her head illformed, and also to many physical and mental evidences of degeneracy and insanity. The defendant's family physician testified that she is irrational, and the other physician sworn in her behalf testified that taking into account her family history and what he had discovered by his personal examination of her that in his opinion she was, always had been and always would be insane and irresponsible. His opinion of the defendant's insanity and irresponsibility may be weighed in connection with his further testimony that all habitual criminals are insane and that all criminals are more or less insane and irresponsible.

The People in rebuttal produced a physician who examined the defendant at a time prior to the homicide when she made

application to a benevolent insurance company for insurance upon her life, and he says that he asked her certain questions and wrote her answers as given, and subsequently read to her the answers that he had written to such questions and she stated that they were correctly written by him and that she then signed and swore to the paper. In such statement every important fact relating to her family history and personal health, detailed by the experts sworn on her behalf at the trial, was denied, and she therein stated that no relative of hers had ever been insane and that she never had fits or halucinations.

The People also produced the persons with whom she was employed in Binghamton and Buffalo, and they each testified to defendant's good health and each related incidents from her conversations and acts and testified that they impressed them as wholly rational.

The People also produced three physicians, all experts in lunacy, who examined her before the trial so far as she would assent to an examination, and who watched her during a preliminary examination before the committing magistrate and at the trial, and testified both from their personal examination of her and as experts, and in answer to hypothetical questions, that she was not insane but sane and responsible for her acts,

At the close of a prolonged trial, at which a mass of testimony was taken, the case was given to the jury after a charge by the court that was full, clear and fair, and to which no exception was taken by the defendant except upon two unimportant matters unnecessary to be stated or discussed in this opinion. While no person actually saw the defendant either alone or with her husband in the actual commission of the homicide, the testimony is such in connection with all of the surrounding circumstances that the inference of guilt by the defendant is irresistible. It was clearly a deliberate and intentional act. There are no circumstances that point to justification or that mitigate its heinousness.

It is provided by the Penal Code (§ 21): " A person is not

excused from criminal liability as an idiot, imbecile, lunatic, or insane person, except upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as either,

" 1. Not to know the nature and quality of the act he was doing ; or

" 2. Not to know that the act was wrong."

The question whether the defendant at the time of the homicide was laboring under such a defect of reason as not to know the nature and quality of the act, or to appreciate the wrong of willfully taking another's life, is like every other question of fact, to be determined by the jury. Unless the verdict of the jury, therefore, is against the weight of the testimony, their conclusion against her upon that as well as upon every other issue in the case must be sustained. (*People* v. *Silverman*, 181 N. Y. 235; *People* v. *Spencer*, 179 N. Y. 408; *People* v. *Egnor*, 175 N. Y. 419; *People* v. *Ferraro*, 161 N. Y. 365; *People* v. *Sutherland*, 154 N. Y. 345; *People* v. *Burgess*, 153 N. Y. 561; *People* v. *Kerrigan*, 147 N. Y. 210; *People* v. *McElvaine*, 125 N. Y. 596.)

That the defendant had an inferior and untrained intellect is indisputable and that her moral perceptions were of a low order is clear. The jury were not required to pass upon the quality and strength of her intellect, or upon her moral perceptions, except as such questions affect the general question of the defendant's knowledge at the time of the homicide of the nature and quality of the act she was doing. A weak or even a disordered mind is not excused from the consequences of crime. (*People* v. *Burgess, supra.*)

The testimony that we have quoted and specially referred to, as well as other testimony in the record, shows that the defendant enjoyed the thought of possessing property. She desired possession of the Brennan property. Months before the homicide she concededly impersonated Mrs. Brennan in signing and acknowledging the deed to her husband. She apparently appreciated the fact that the judgments against her made it undesirable to have the title of the property in her

own name.   To what extent Mrs. Brennan may have known about and assented to the execution of the deed of October 31 is of little importance at the present time.   Possession of the property was the important and concluding act to consummate the desire that clearly appears to have affected the defendant for weeks prior to the homicide.   Unless Mrs. Brennan voluntarily surrendered possession of the real property, there remained a serious barrier to the defendant's moving into the Brennan house.   Whatever may have been the motive actuating the defendant at the time, the homicide was in fact committed and there is no basis for the suggestion that it was justified or that it resulted from mischance, or that it was done in a sudden fit of anger.   It was not only a deliberate act but it was immediately and carefully concealed and followed at once by the exercise of authority over and actually taking possession of the Brennan house and the exclusion of Mr. Brennan therefrom.

The alleged strange, peculiar and unnatural acts and words of the defendant and the opinions of the experts called in her behalf did not require a different verdict by the jury.   Their verdict that the defendant was guilty of the crime of murder in the first degree is not against the weight of the testimony.

The defendant now claims that certain errors were committed upon the trial which require that the judgment of conviction should be reversed.   The homicide was committed during the sitting of a Trial Term of the Supreme Court held in and for the county of Jefferson.   The said term of court was duly convened on April 16.   A grand jury was duly drawn and convened at said term, but had completed its work and was duly discharged by the court on April 9.   On April 30 after the homicide and while said court remained in session, the district attorney on proof by affidavit that the crime of murder had been committed during the sitting of the court and after the discharge of the grand jury convened therefor, asked that an order be entered pursuant to section 235 of the Code of Criminal Procedure for the investigation of said crime. An order was thereupon entered directing the clerk to forth-

with bring into court the box containing the names of persons duly qualified to serve as grand jurors, in and for the county of Jefferson, and therefrom in open court to draw in the manner provided by law the names of twenty-four persons to serve as grand jurors in connection with said term of court. And it was therein further ordered that the sheriff of Jefferson county summon, in the manner prescribed for grand jurors in general, the persons whose names should be so drawn to appear in court on May 11, 1908, at ten o'clock in the forenoon of that day to serve as grand jurors upon another grand jury to be convened in connection with said term of court.

Twenty-four names were thereupon drawn in open court and in the presence of the county judge and of the sheriff of said county, as provided by said order. They were duly summoned and convened on said May 11 and proceeded to investigate said crime, and on May 14 delivered to the court the indictment on which the defendant has been tried, and they were thereupon discharged. The defendant was thereafter arraigned and her counsel objected to the jurisdiction of the court, and moved to set aside the indictment upon the ground, in substance, that the body of men that found the indictment against the defendant was not drawn and summoned as provided by law or as provided by section 227 or section 235 of the Code of Criminal Procedure, and that the order therefor was not entered at least twenty days before the term for which said jury was ordered, and also that fourteen days had not elapsed from the time the grand jury was chosen until they were summoned and began their sitting, as required by section 238, subdivision 4, of said Code.

The motion was denied. The defendant urges that said motion should have been granted. The grand jury was not one drawn as prescribed by section 225 and section 226 of the Code of Criminal Procedure. It was "another grand jury." Provision for drawing another grand jury is expressly given in section 235 of the Code of Criminal Procedure, which is as follows : " If a crime be committed during the sitting of the court,

after the discharge of the grand jury, the court may, in its discretion, direct an order to be entered, that the sheriff summon another grand jury ; and the same shall be summoned, in the manner prescribed for grand juries in general."

The provisions of section 227 of the Code of Criminal Procedure relating to the number of days that the order shall be entered in the county clerk's office prior to the term for which the jury is ordered, and also the statutory provisions relating to the number of days that the jury shall be drawn prior to the holding of the term for which they are drawn, are manifestly inapplicable to the case of "another grand jury" provided by said section 235. Such section gives to the court in its discretion the right to order a grand jury for the term of court then sitting. Where the court in its discretion grants an order for the purpose of convening another grand jury, it is for the express purpose of the investigation of the facts and circumstances attending the commission of a crime committed after the term of court has commenced and after the grand jury convened therewith has been discharged. It is because the court in its discretion deems it desirable to investigate the facts and circumstances of said crime before the meeting of a grand jury to be drawn for a subsequent term of court. The only provision of section 235 relating to the drawing, summoning and convening of such "another grand jury" is that "the same shall be summoned in the manner prescribed for grand juries in general." They were so summoned. There is another reason why the motion was properly denied, and that is that the Code of Criminal Procedure expressly provides when an indictment may be set aside on motion (§ 313). No objection was ever made to the panel of grand jurors as prescribed by section 238 of said Code. The motion made was at a time subsequent to the discharge of the grand jury and related to the indictment and the work of the grand jury and not to the grand jury itself. The defendant's constitutional rights were not invaded. (*People* v. *Borgstrom,* 178 N. Y. 254.)

The attorney who drew the deed of October 31 was called

by the People, and he was allowed to testify that the defendant at the time said to him that she was Sarah Brennan and that she signed the deed and acknowledged the execution thereof before him as a notary public. This testimony was given subject to an objection by the defendant that it was incompetent under section 835 of the Code of Civil Procedure. Subsequent to the homicide said attorney with others was in the presence of the defendant, and she admitted that she had stated to such attorney at the time of the execution of the deed that she was Mrs. Brennan, and that she executed and acknowledged the deed in the name of Sarah Brennan. After such a voluntary disclosure by the defendant of the facts relating to the transaction the protection of said section of the Code is waived, at least to the extent of such voluntary disclosure. (*People* v. *Bloom,* 193 N. Y. 1.)

The section of the Code mentioned was not intended to prohibit the disclosure of a communication so far as such communication is necessary to enable a public officer to act in his official capacity. There is a third reason why the evidence was properly received, and that is that the seal of personal confidence can never be used to cover a transaction which is in itself a crime. (*Bank of Utica* v. *Mersereau,* 3 Barb. Ch. 528–598.)

The defendant also insists that the court erred in denying her the right to a preliminary examination of one of the witnesses before he testified to certain confessions alleged to have been made by her. The request to be allowed such preliminary examination was made after the sheriff had been fully and at length examined and cross-examined with reference to the confessions of the defendant, and it was not until the witness giving his testimony at the time of the request had been fully examined as to everything relating to the defendant's confessions except as to statements made by her at the jail. The reason for the rule which requires that the defendant shall be given full opportunity before testimony of alleged confessions is given to show that the same were involuntary and made under the influence of fear produced

by threats, is to avoid the possibility of a jury hearing such alleged confessions which may subsequently appear to be inadmissible. To avoid the possibility that a jury may be unconsciously influenced by alleged confessions admitted in evidence and afterwards stricken out as inadmissible requires that the defendant's right to said preliminary examination should be rigidly enforced whenever by any reasonable possibility the confessions may be inadmissible under section 395 of the Code of Criminal Procedure.

In this case it appeared at the time when the request was made for a preliminary examination that it was not in fact preliminary to the confessions, but that the defendant's confessions had been already heard by the jury and that the testimony then sought only related to the execution of the deed and to a repetition of confessions already in evidence. At the time of the request it appeared by testimony then before the court that the confessions were made by the defendant without threats or promises of any kind. This court has recently on two occasions so fully discussed the subject of such preliminary examinations and the rules of law governing the same that it is unnecessary to further consider the subject in this opinion. (See *People* v. *Rogers*, 192 N. Y. 331, and *People* v. *Brasch*, 193 N. Y. 46.)

The defendant also claims that the court erred in refusing to allow an attorney, who called upon Mrs. Brennan in January preceding the homicide, to testify to a conversation with Mrs. Brennan in regard to the deed to Mr. Farmer. The attorney represented a client who had prior thereto brought an action against Mrs. Brennan for slander. A summons had been served in the action and more than twenty days had expired and as Mrs. Brennan had not appeared in the action the attorney called to talk with her about the same. At the request of the counsel for the People and also for the defendant, we received on the argument and now have before us the testimony of said witness given on a trial of an action brought subsequent to the homicide to set aside the deeds of October 31 and January 7. His testimony in that action is

admitted to be the same as he would have given in this case
had he been allowed to do so by the court. His testimony
there given, so far as it relates to Mrs. Brennan and said deed,
is as follows: "I said in substance, ' What do you intend to
do ?' and she said, 'I will do nothing.' I then said to her,
' Well, Mrs. Brennan, I see that you went to Tom Burns and
Tom drawed a deed of your house,' and she then said, ' Well,
didn't I have a right to ?' or 'I had a right to do it.' I can't
say just what she said about the words. Q. Did you say to
her, ' That only means another lawsuit to set aside the deed to
reach your property.' A. I said that or something like it.
Q. And did she say, 'I have no property to reach,' or that in
substance ? A. That in substance she said."

The conversation on Mrs. Brennan's part was evasive and
negative, but as it bore to some extent upon her knowledge of
the deeds of October 31 and January 7, we think it should
have been received, but its receipt could not have affected the
result. The defendant's explanation of the transactions relat-
ing to the deeds was before the jury. It appeared that Mr.
Brennan had been told of the deeds and that he had talked
with his wife about them. We have already shown that the
extent of Mrs. Brennan's knowledge of the deeds, or even her
assent to or ratification of them, is of little importance for the
reasons stated. So long as Mr. and Mrs. Brennan remained
in possession of the property, the deeds executed, it may be
conceded pursuant to some friendly agreement between Mrs.
Brennan and the defendant, were of little value to her. Such
conversation did not bear upon the main fact of the homicide
itself. Where motive is an important factor in determin-
ing whether a defendant committed an alleged homicide
and evidence in explanation of an apparent motive is improp-
erly excluded at the trial, a judgment of conviction if obtained
would have to be reversed for such error.

The evidence in this case to show that the defendant killed
Mrs. Brennan is practically undisputed and altogether conclu-
sive. The evidence excluded bore only upon the defendant's
motive in committing the crime and its effect upon that ques-

tion is slight — but little, if any, more than infinitesimal. When a crime has been fully proven, the nature and extent of the motive is unimportant. (*People* v. *Feigenbaum*, 148 N. Y. 636; *People* v. *Ferraro*, 161 N. Y. 365.)

The rejection of evidence does not furnish a ground for the reversal of a judgment of death when it is apparent that no harm resulted to the defendant by reason thereof. (Code of Criminal Procedure, § 542; *People* v. *Burgess*, 153 N. Y. 561; *People* v. *Meyer*, 162 N. Y. 357; *People* v. *Sutherland*, 154 N. Y. 345; *People* v. *Bonier*, 179 N. Y. 315; *People* v. *Silverman*, 181 N. Y. 235, 244.)

The defendant's counsel calls our attention to many other rulings made upon the trial which he insists were erroneous. We do not find any error in such rulings. The defendant had a fair trial and the judgment of conviction should be affirmed.

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, HAIGHT, VANN and HISCOCK, JJ., concur.

Judgment of conviction affirmed.