THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. HENRY W. SLAUGHTER, Appellant.

Fourth Department, April 9, 1970.

*Lipsitz, Green, Fahringer, Roll, Schuller & James (Herald Price Fahringer of counsel), for appellant.*

*Michael F. Dillon, District Attorney (Peter J. Notaro of counsel), for respondent.*

BASTOW, J. An indictment was returned against appellant in October, 1965 charging him with the crime of murder, first degree. Following a jury trial he was convicted of murder, second degree. We reversed and granted a new trial because of prejudicial remarks made by the prosecutor upon the question of appellant's insanity which we found to be a " substantial issue " in the case (28 A D 2d 1082).

Thereafter appellant waived a jury trial and following a non-jury trial he was again convicted of murder, second degree. The sole issue litigated was defendant's mental condition at the

time of the commission of the crime. We conclude that the finding, implicit in the verdict, that appellant at the time he committed the homicide did not suffer from a mental disease which caused him to lack substantial capacity to know or appreciate the nature and consequences of such conduct or that such conduct was wrong was contrary to the proof. We briefly state our evaluation of the pertinent evidence.

For at least 10 years prior to the commission of the senseless homicidal act in 1965 defendant suffered from mental illness. His condition steadily worsened through the years and this was aggravated by excessive consumption of alcohol. The first crisis arose in July, 1960 when he molested his 11-year-old daughter. He thereupon committed himself to the psychiatric ward of a Buffalo hospital. A few months after his discharge from this hospital he committed himself to Gowanda State Hospital where he was a patient for several months. He was diagnosed as a psychopathic personality with pathological sexuality. The prognosis was " guarded ".

During the following years he received regular treatment from several psychiatrists and pathologists at a Buffalo Service Center. For about a year he was treated by a psychiatrist at another Buffalo hospital where his wife was employed. This free treatment ended about a year before the homicide when his wife terminated her employment at the hospital. The attending psychiatrist at this institution found a " profound paranoid pattern " and significantly, following the last interview wrote " that basically the paranoid ideation is still very much in the picture and I don't think it would take much to have it flare."

Thirteen months later defendant shot a man following a barroom discussion and wager as to how many players in a baseball season had hit 60 home runs. Appellant returned to his home and his wife called a lawyer who was a member of a well-known Buffalo law firm. Upon his arrival he explained to defendant that he was not a criminal lawyer but would discuss the facts in complete confidence. The attorney related that during the ensuing conversation defendant stared " off into space ". He was turned over to the police.

It is against this background that we consider the trial psychiatric evidence. The defense called two psychiatrists both of whom had eminent qualifications — one had been practicing his profession for 40 years. Each before examining appellant studied the records of the several mental hospitals — Meyer Memorial, Buffalo General, Gowanda State, and Jewish Community Service Center — where defendant had received psychiatric treatment in earlier years. The examination of one of

the psychiatrists covered a period of two and one-half hours. The other psychiatrist made two examinations separated by a period of seven months. Each expressed the opinion that appellant was a paranoid schizophrenic and unequivocally stated that this was a mental disease from which he was suffering at the time of the homicide that caused him to lack substantial capacity to know or appreciate the nature of his conduct or that his conduct was wrong.

In rebuttal the People called a psychiatrist, who prior to the first trial had been appointed by the court for the sole purpose of determining whether defendant was mentally capable of understanding the charge against him or of making his defense (Code Crim. Pro., § 658). The examination lasted in the words of the doctor "probably close to an hour." The doctor conceded that prior to testifying at the first trial she had not seen the records of Gowanda State Hospital and had only examined them "just this morning" prior to testifying at this trial. She had not examined at any time the records of Jewish Community Service Center where defendant had received extended psychiatric care.

In view of her brief examination of appellant, the purpose of the examination — to determine appellant's then mental condition to proceed to trial — and her failure to examine the earlier case histories of defendant's prolonged and repeated mental illnesses, it is not surprising that her direct testimony (including her qualifications) covers slightly more than five pages in the record. In reply to leading questions the doctor routinely opined that on the crucial date defendant knew the nature and quality of his act and that it was wrong.

When, as here, the defense of insanity is raised the People must establish on the whole case beyond a reasonable doubt both that the defendant knew the nature and quality of his act and that he knew the act was wrong (*People* v. *Kelly*, 302 N. Y. 512, 515). We conclude that the proof of the People was woefully inadequate to sustain the burden thus placed upon them.

It follows that the finding on this issue, implicit in the verdict of the trial court, was against the weight of the evidence. (Cf. *People* v. *Lee*, 29 A D 2d 837.) A new trial is mandated because the verdict was against the weight of the evidence and in the interest of justice. (Code Crim. Pro., § 527.)

The judgment should be reversed and a new trial granted.

MOULE, J. (dissenting). Although the defendant did have a history of mental illness, the trier of the facts determined that

it did not constitute insanity as defined by section 1120 of the Penal Law.

A psychiatrist who, as defendant's counsel stipulated, was eminently qualified and had been Chief Psychiatrist at the E. J. Meyer Memorial Hospital, testified that she examined defendant not only to determine if he was able to assist in his defense but also to determine whether he was criminally responsible at the time of the commission of the act. She stated she reviewed the E. J. Meyer Memorial Hospital and Gowanda State Hospital records to determine whether or not his conduct at the time the act was committed, as she put it, "fitted into the statute". She said that at the E. J. Meyer Memorial Hospital defendant had been called a chronic alcoholic and at the Gowanda State Hospital a psychopathic sexualis. She also considered his conduct at the time of the shooting.

It was her opinion, based on these considerations, that defendant not only could assist in his defense but also had substantial capacity to know and appreciate the nature of his conduct and the psychiatrist was sure that defendant knew whether or not his conduct was wrong.

Further, the circumstances under which the defendant killed the deceased were calculated and deliberate and did not indicate any lack of criminal responsibility. He was well able to relate the facts leading up to the shooting to the attorney called by his wife before he was turned over to the police, even though in doing so he exaggerated various complaints.

The facts surrounding the defendant's killing of the deceased indicate a calculated and deliberate act. Defendant had an argument with a bartender in a cocktail lounge about how many times 60 home runs had been hit in one baseball season. The defendant had some money on the bar and the bartender claimed the defendant had made and lost a bet. The defendant denied a bet had been made. The bartender took defendant's money and bought a drink for everyone in the lounge and gave defendant the change. The defendant said he wanted all of his money and the bartender refused to give it to him.

The defendant then left the bar and drove some distance to his home in his car. He told his wife that someone had taken his money and he got a shotgun. His wife, fearing what might happen, hid his car keys, but he took hers out of her purse and left. Defendant drove back to the lounge with the shotgun. He did not see the bartender inside and so he went outside to wait for him. In about 10 or 15 minutes defendant saw the bartender leave the tavern and get into his car and the defendant then shot

him. Such actions on the part of the defendant indicate calculation, cunning, deliberation and patience and show criminal responsibility.

It is well settled that " the fact that a defendant was suffering from some type of mental disorder (*People* v. *Browne,* 2 N Y 2d 842), or that he had a psychopathic personality (*People* v. *Papa,* 297 N. Y. 974), or that his ' moral perceptions were of a low order ' (*People* v. *Farmer,* 194 N. Y. 251, 265), or that he had an irresistible impulse to commit the crime (*People* v. *Liss,* 9 N Y 2d 999), does not immunize him from criminal responsibility under section 1120 of the Penal Law." (*People* v. *Wood,* 12 N Y 2d 69, 77.)

Since the record in its entirety presented a fair conflict of the evidence, the determination of the trial court should not be interfered with, unless it is clearly against the weight of the evidence (*People* v. *Taylor,* 138 N. Y. 398, 405).

GOLDMAN, P. J., WITMER and GABRIELLI, JJ., concur with BASTOW, J.; MOULE, J., dissents and votes to affirm, in opinion.

Judgment reversed on the law and facts and in the interest of justice and a new trial granted.